RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0288p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

HENRY HILL, et al.,

*Plaintiffs-Appellants,*

*v.*

RICK SNYDER, et al.,

*Defendants-Appellees.*

No. 17-1252

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:10-cv-14568—John Corbett O'Meara, District Judge.

Argued: September 13, 2017

Decided and Filed: December 20, 2017

Before: MERRITT, STRANCH, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Deborah LaBelle, Ann Arbor, Michigan, for Appellants. B. Eric Restuccia, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** Deborah LaBelle, Ann Arbor, Michigan, Brandon J. Buskey, Steven M. Watt, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Daniel S. Korobkin, Michael J. Steinberg, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for Appellants. B. Eric Restuccia, Margaret A. Nelson, Joseph Froehlich, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

―――――――――――

**OPINION**

―――――――――――

JANE B. STRANCH, Circuit Judge.   Since 2010, Plaintiffs have sought federal court review of the punishments Michigan may constitutionally impose on individuals convicted of first-degree murder for acts they committed as children.   When we last considered this case, the legal landscape had changed in a few fundamental ways:   The Supreme Court had twice ruled that the unique characteristics of youth must factor into sentencing decisions for juvenile offenders facing life imprisonment, and the Michigan Legislature had amended its statutory scheme to implement these rulings.   Recognizing the import of these developments, we remanded the case to the district court with express instructions that the parties be authorized to amend the pleadings.   The Plaintiffs heeded our opinion and filed a Second Amended Complaint (SAC) in June 2016.   Now, as before, they assert that Michigan's sentencing scheme and parole system deny youth offenders a meaningful opportunity for release.   The district court determined that jurisprudential concerns barred Plaintiffs' claims and dismissed the SAC in its entirety.

Although we agree that certain claims in the SAC may not proceed, we do not find that the concerns articulated by the district court require dismissal of the entire action.   Accordingly, for the reasons that follow, we **AFFIRM** the district court's dismissal of Counts I and II, **REVERSE** the district court's dismissal of Counts IV, V, and VI, and **REMAND** for further proceedings consistent with this decision.

## I.  BACKGROUND

We provided a thorough recitation of the factual and procedural history to date in the previous opinion in this case.   *See Hill v. Snyder* (*Hill I*), 821 F.3d 763 (6th Cir. 2016).   The legal issues now presented call for some repetition, and there have been several developments in the intervening time period.

## A.  Case Overview

Plaintiffs are individuals who received mandatory sentences of life without parole for crimes they committed while below the age of eighteen.  They originally filed this case in November 2010, asserting claims under 42 U.S.C. § 1983.  Then, as now, Plaintiffs asserted that Michigan's sentencing scheme violated their constitutional rights by depriving them of a meaningful opportunity for release.  Plaintiffs specifically challenged the then-applicable statutory provisions that excluded youth offenders who were convicted of first-degree murder from the jurisdiction of the Michigan Parole Board.  *See* Mich. Comp. Laws § 750.316 (life imprisonment without parole for first-degree murder); Mich. Comp. Laws § 791.234(6)(a) (ineligibility for parole for people convicted of first-degree murder under Section 750.316).  The Plaintiffs filed an amended complaint to add four more Named Plaintiffs in February 2012, four months before the Supreme Court decided *Miller v. Alabama*, 567 U.S. 460 (2012).  *Miller* held that the Eighth Amendment prohibits mandatory sentences of life without parole for those under the age of eighteen at the time of their crimes.  *See* 567 U.S. at 489.  Following *Miller*, the district court granted partial summary judgment to the Plaintiffs, holding that Michigan's sentencing scheme violated the Eighth Amendment's prohibition of cruel and unusual punishment by mandating life sentences without parole for juveniles convicted of first-degree murder.  The district court also issued an injunction directing the Defendants to consider all juvenile offenders who were sentenced to mandatory life in prison immediately eligible for parole.

Defendants appealed the injunction to this court.  While the appeal was pending, Michigan amended its sentencing scheme to prospectively address the effect of *Miller*.  The Legislature enacted a new statutory provision, which covered both juveniles convicted of first-degree homicide after *Miller* and those juveniles whose cases were still pending or eligible for direct appellate review at the time of the statute's enactment.  *See* Mich. Comp. Laws § 769.25.  This new provision allows prosecutors to seek life-without-parole sentences for juveniles convicted of first-degree homicide crimes by filing a motion specifying the grounds for imposing that punishment.  *Id.* § 769.25(3).  It also requires courts to conduct a hearing on such motions, where the judge "shall consider the factors listed in *Miller v. Alabama*, . . . and may consider any

other criteria relevant to its decision, including the individual's record while incarcerated." *Id.* § 769.25(6) (citation omitted). If the court does not sentence the individual to life without parole, the court must sentence the individual to a minimum term of 25 to 40 years and a maximum term of 60 years. *Id.* § 769.25(9).

Michigan simultaneously enacted Section 769.25a, which anticipated a United States or Michigan Supreme Court decision making *Miller* retroactively applicable. Mich. Comp. Laws § 769.25a(2). This provision applies to juveniles who were convicted of first-degree homicide offenses before *Miller* and who received mandatory sentences of life without parole. *Id.* Section 769.25a incorporates portions of Section 769.25 and relies on the same process for imposing renewed life-without-parole or term-of-years sentences. In January 2016, the Supreme Court held that *Miller* established a new substantive rule of constitutional law that applies retroactively, *Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016), and thereby triggered implementation of Section 769.25a. This panel subsequently issued its decision in Defendants' appeal of the district court's injunction, vacating the order and remanding the case with instructions to grant the parties leave to amend the pleadings and supplement the record in light of the changed legal landscape from *Miller*, *Montgomery*, and Michigan's new sentencing statutes. *Hill I*, 821 F.3d at 771.

**B. The Federal Proceedings Since *Hill I***

Approximately six weeks after our decision in *Hill I*, Plaintiffs filed the SAC, which is the subject of this appeal. The Plaintiffs name Governor Rick Snyder; Heidi E. Washington, Director of the Michigan Department of Corrections; Michael Eagen, Chair of the Michigan Parole Board; and Bill Schuette, Michigan Attorney General, as defendants. The SAC alleges that: Section 791.234(6) continues to be enforced against Plaintiffs in violation of the Eighth and Fourteenth Amendments (Count I); Michigan's amended sentencing scheme violates the Eighth Amendment by subjecting juvenile offenders to sentences of life without parole (Count II); Michigan's policies and procedures governing parole deny Plaintiffs a meaningful opportunity for release in violation of the Eighth and Fourteenth Amendments (Count IV); the deprivation of Plaintiffs' good time and disciplinary credits in Section 769.25a(6) violates the *Ex Post Facto* Clause (Count V); and Defendants have failed to provide the Plaintiffs with access to

programming, education, training, and rehabilitation opportunities in violation of the Eighth and Fourteenth Amendments (Count VI).[1]

Soon after filing the SAC, Plaintiffs sought a temporary restraining order (TRO) and a preliminary injunction to prevent prosecutors from filing motions seeking renewed sentences of life without parole under Section 769.25a(4)(b). The district court granted Plaintiffs' motion for a TRO, but this court stayed the TRO pending the district court's decision on the preliminary injunction. The district court subsequently denied Plaintiffs' request for a preliminary injunction, finding that they were unlikely to succeed on the merits of their claims.

Following briefing and oral argument, the district court granted Defendants' motion to dismiss the SAC. The district court determined that Count I was moot because the Michigan mandatory life-without-parole statute, Section 791.234(6), no longer applied to the Plaintiffs. The district court dismissed Counts II, IV, and VI as not cognizable under 42 U.S.C. § 1983 pursuant to the rule set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). In the alternative, the district court held that the abstention doctrine outlined in *Younger v. Harris*, 401 U.S. 37 (1971), rendered federal court consideration of those counts inappropriate. Finally, the district court dismissed Count V for failure to state a claim after finding that the Plaintiffs could not show that they were disadvantaged by the elimination of good time and deprivation credits as needed to establish an *Ex Post Facto* Clause violation. Plaintiffs brought this timely appeal.

### C. Michigan's Current Statutory Scheme

Michigan relies on a web of sentencing and parole statutes, many of which incorporate each other by reference. A number of these provisions are at issue in this appeal, and we pause to identify those implicated by Plaintiffs' claims in the SAC:

- Section 750.316: This provision identifies first-degree murder crimes and states that such crimes are punishable by life imprisonment without eligibility for parole. As of 2014, this section specifically excepts individuals covered by Sections 769.25 and 769.25a, which cover youth offenders.

- Section 791.234(6): This provision states that prisoners sentenced to life imprisonment, including individuals sentenced under Section 750.316, are not eligible

---

[1]Plaintiffs voluntarily dismissed Counts III and VII.

for parole. Because Section 750.316 now excepts youth offenders, Section 791.234(6) does not apply to Plaintiffs.

- Section 769.25: This provision applies to juveniles convicted of first-degree murder crimes after *Miller*. It outlines the process by which prosecutors may seek and courts may consider *Miller*-compliant sentences of life without parole for youth offenders; the term-of-years sentences that apply in the absence of a prosecutorial motion seeking life without parole; and the elimination of good time and disciplinary credits. This provision does not require courts to consider the *Miller* factors when sentencing youth offenders to terms of years. *See* Mich. Comp. Laws § 769.25(9).

- Section 769.25a: This provision applies to juveniles who received mandatory sentences of life without parole before *Miller* and who are now entitled to resentencing, including Plaintiffs. This provision incorporates portions of Section 769.25 and outlines the process by which prosecutors may seek and courts may consider renewed sentences of life without parole; the term-of-years sentences that apply in the absence of a prosecutorial motion seeking life without parole; and the elimination of good time and disciplinary credits. This provision does not require courts to consider the *Miller* factors when resentencing youth offenders to terms of years. *See* Mich. Comp. Laws § 769.25a(4)(c).

- Sections 791.231 through 791.246: These provisions govern parole eligibility and consideration. Among other things, they enumerate factors that guide the Michigan Parole Board's parole decisions, *see* Mich. Comp. Laws § 791.233e, and endow the Board with discretion to deny parole to those who are eligible, *see id.* § 791.234(11). These provisions do not require the Board to consider the *Miller* factors when considering parole for youth offenders.

In short, Michigan's amended sentencing scheme relies on Sections 769.25 and 769.25a to sentence and resentence youth offenders convicted of first-degree murder crimes. Youth offenders are now outside the ambit of Section 750.316 and Section 791.234(6), at least insofar as those provisions exclude them from parole eligibility. Those youth offenders who are or will be eligible for parole are subject to the same parole consideration processes as adult offenders.

**D. Resentencing Post-*Montgomery***

At present, class members fall into one of two broad categories: They either face prosecutorial motions for renewed sentences of life without parole, or they have been resentenced to a term of years.

The Supreme Court emphasized that the sentence of life without parole should be imposed on youth offenders in only the "rarest" of circumstances. *Montgomery*, 136 S. Ct. at

734; *see also Miller*, 567 U.S. at 479 ("[W]e think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon."). Michigan prosecutors apparently believe that seventy percent of the Plaintiffs present rare and uncommon cases of "irreparable corruption." *Miller*, 567 U.S. at 479–80 (citations removed). Approximately 250 class members face prosecutorial motions requesting that they again receive sentences of life without parole. These individuals will eventually be resentenced under Sections 769.25 and 769.25a, but two cases pending before the Michigan Supreme Court have delayed their *Miller* hearings. *See People v. Skinner*, 889 N.W.2d 487 (Mich. 2017) (mem.); *People v. Hyatt*, 889 N.W.2d 487 (Mich. 2017) (mem.). *Skinner* and *Hyatt* address the amended statutory provisions that authorize judges—not juries—to make factual findings regarding the *Miller* factors when sentencing juvenile offenders to life without parole. *See* Mich. Comp. Laws §§ 769.25(6), (7), 769.25a(4)(b). Although that issue has not been raised in this case, *Skinner* and *Hyatt* have nevertheless delayed the Michigan sentencing and appeals processes for youth offenders convicted of first-degree murder. *See People v. Boyd*, No. 1995-137251-FC (Mich. Cir. Ct. Aug. 24, 2016) (ordering that the resentencing of one of the Named Plaintiffs in this case be stayed pending *Skinner* and *Hyatt*); *see also, e.g., People v. Zuniga*, 893 N.W.2d 633 (Mich. 2017) (mem.) (holding a youth offender's sentencing appeal in abeyance pending decisions in *Skinner* and *Hyatt*). Accordingly, this group of roughly 250 class members must await resolution of *Skinner* and *Hyatt* before they may receive a new *Miller*-compliant sentence under Sections 769.25 and 769.25a.

The remainder of the class did not face motions for renewed sentences of life without parole. At argument, counsel for Defendants represented that approximately 100 class members had already been resentenced to terms of years, and indicated that the rest of this group would soon receive new sentences. Some of these individuals are already eligible for parole.

## II. DISCUSSION

### A. Standard of Review

We apply de novo review to a district court's grant of a motion to dismiss, *Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 637 (6th Cir. 2017), including where dismissal is based on

jurisprudential grounds, *see Nimer v. Litchfield Twp. Bd. of Trs.*, 707 F.3d 699, 700 (6th Cir. 2013) (de novo review of abstention under *Younger*); *Ammex, Inc. v. Cox*, 351 F.3d 697, 704 (6th Cir. 2003) (de novo review of dismissal based on mootness); *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998) (de novo review of dismissal based on the *Heck* doctrine). We construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

**B. Mootness**

Count I of the SAC asserts that Defendants continue to unconstitutionally enforce Section 791.234(6) against Plaintiffs. A subsection of the parole eligibility statute, Section 791.234(6), excludes individuals sentenced to life in prison from the jurisdiction of the Michigan Parole Board. It accomplishes this by incorporating by reference individuals who are sentenced to life in prison for first-degree murder under Section 750.316. As noted above, Section 750.316 now expressly excepts juvenile offenders convicted of first-degree murder, who instead receive sentences pursuant to Sections 769.25 and 769.25a. Plaintiffs argue in Count I that class members who have not yet been resentenced remain confined subject to Section 791.234(6), and therefore are still not eligible for parole consideration.

The district court dismissed Count I as moot because the challenged provision "no longer applies to Plaintiffs." Mootness is one of Article III's justiciability requirements. "The jurisdiction of federal courts extends only to actual, ongoing cases or controversies. A case may become moot if, as a result of events that occur during pendency of the litigation, the issues presented are no longer 'live' or parties lack a legally cognizable interest in the outcome." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 581 (6th Cir. 2012) (citations omitted). Among the events that may moot a claim is the "[l]egislative repeal or amendment of a challenged statute," which "usually eliminates this requisite case-or-controversy." *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 822 (6th Cir. 2012) (quoting *Ky. Right to Life v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997)).

Legislative action ordinarily moots a case midstream, when a challenged provision is repealed or amended during the pendency of the litigation. In such circumstances, courts must determine whether a statute has been "sufficiently altered so as to present a substantially different controversy." *Id.* at 823 (citation omitted). So it is here: Count I challenges a statutory provision that ceased to apply to Plaintiffs six months before they filed the SAC. When the Supreme Court released its decision in *Montgomery*, it triggered Section 769.25a, which altered the web of Michigan sentencing statutes in a material way. Sections 769.25 and 769.25a now exclude Plaintiffs from Section 750.316, which in turn excludes them from the purview of the provision named in Count I, Section 791.234(6). Plaintiffs provide no specific information regarding the continued enforcement or application they allege. They do not say who is enforcing this section or by what means. Instead, the gravamen of Count I seems to be that many class members have yet to receive new sentences. Plaintiffs contend that, absent resentencing, their confinement traces back to the prior unconstitutional sentencing scheme, which included Section 791.234(6).

We are sensitive to Plaintiffs' concerns about the delay in resentencing. Approximately 250 class members remain in limbo. *See supra* Part I.D. These individuals have been eligible for resentencing since January 2016, when the Supreme Court decided *Montgomery*, but the machinery of justice has come to a halt due to external circumstances, namely, the Michigan Supreme Court's pending decisions in *Skinner* and *Hyatt. Id.* The delay in resentencing endured here certainly gives us pause. But resentencing pursuant to Sections 769.25 and 769.25a, although slow, is inevitable. Michigan has already resentenced nearly all of the class members not facing a prosecutorial motion for a renewed sentence of life without parole. Defendants' implementation of the amended sentencing scheme with respect to those class members further undermines Plaintiffs' assertions that Section 791.234(6) is still being enforced or applied to youth offenders. Because Section 791.234(6) no longer operates against the class, we agree with the district court that Count I is moot.

In affirming the district court's dismissal of Count I as moot, we do not mean to say that an individual stuck in carceral limbo pending resentencing may never challenge his continued confinement—an unwarranted or impermissible delay in resentencing sounds in procedural due

process.  We only reaffirm the well-established legal principle that a claim premised on a statute that no longer applies to the challenging party does not satisfy Article III's case-or-controversy requirement.**²**

### C. *Younger* Abstention

The district court found that federal court abstention was appropriate under the doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971), and dismissed Counts II, IV, and VI on that basis.  The *Younger* doctrine is a judicial creation born from the principles of equity, comity, and federalism.  *Id.* at 44.  It permits federal courts to withhold authorized jurisdiction in certain circumstances to avoid undue interference with state court proceedings.  *Id.* at 43–44.  The Supreme Court has "carefully defined, however, the areas in which such abstention is permissible, and it remains the exception, not the rule." *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans* (*NOPSI*), 491 U.S. 350, 359 (1989) (citations omitted).  Federal courts are to treat *Younger* as a limited carve-out to federal courts' "virtually unflagging obligation" to exercise their jurisdiction.  *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) (citation omitted).  The district court engaged in a *Younger* abstention analysis without first considering a critical and dispositive question:  Does the filing of the SAC, seven years into the litigation, require the federal court system to reevaluate whether to exercise its jurisdiction?  We think not.

A concern with the *initiation* of proceedings inheres in the *Younger* doctrine.  Courts look to the moment the federal lawsuit was filed to determine whether it should be allowed out of the starting gate.  *See Fed. Exp. Corp. v. Tenn. Pub. Serv. Comm'n*, 925 F.2d 962, 969 (6th Cir. 1986); *see also James v. Hampton*, 513 F. App'x 471, 474 (6th Cir. 2013).  For this reason, *Younger* abstention issues tend to arise at or near the outset of federal proceedings.  For example, in *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982), a seminal abstention case, the district court dismissed the federal complaint based on *Younger* less than four months after it was originally filed.  *See* Brief for Petitioner at \*7–8, 457 U.S. 423 (1982) (No. 81-460), 1981 WL 389660.  Similarly, in *Hicks v. Miranda*, the abstention issue was

---

**²**Article III is also implicated by Defendants' arguments regarding ripeness, which are addressed in Part II.F, *infra*.

resolved by the federal district court less than six months after the plaintiffs completed service of the complaint. 422 U.S. 332, 338–40 (1975). In *Zalman v. Armstrong*, one of this court's primary cases on abstention, the district court resolved the entire case, including *Younger* issues, in under seventy-five days. 802 F.2d 199 (1986). This focus on initiation persists even if a factual change would alter the *Younger* analysis. For example, the *Zalman* petitioner faced a state prosecution at the time he filed his federal complaint, but the prosecution had been dismissed by the time this court heard his appeal. 802 F.2d at 203. The Sixth Circuit acknowledged this development but still felt it necessary to order the district court to abstain based on *Younger*. *Id*. These cases confirm that *Younger* is inextricably bound up with beginnings. We are far from the beginning of this case, the initiation of which is barely discernible in our rearview mirror.

Defendants nevertheless insist that the SAC constituted a new case and that *Younger* is appropriate because no proceedings on the merits of the SAC have occurred. This argument conflates the question of whether to abstain with the threshold question of whether we should even consider abstention at this juncture. Defendants offer no authority, and we can find none, that would support the proposition that the filing of an amended complaint requires a federal court to reexamine whether to exercise its duly-authorized jurisdiction. Adopting this position would muddle what is now a practical and common-sense doctrine. While litigants presumably know if they face state court prosecutions at the time they file related federal complaints, they cannot predict future prosecutions. Yet Defendants' approach would allow subsequent unforeseen prosecutions to cut the legs out from under long-running federal litigation. And if courts were to reconsider exercising their jurisdiction at every amendment, plaintiffs would risk sacrificing federal claims for fear of a late-stage *Younger* analysis. Indeed, the potential for *Younger* abstention would loom large over plaintiffs seeking to refine their claims and streamline litigation.

Defendants also do not explain when an amended complaint rises to the level of a "new case." That very concept is at odds with the idea of amending pleadings, a practice deliberately built in to our civil justice system. Federal Rules of Civil Procedure 15 and 16 govern amendments, and they ensure that new allegations relate back to the original pleading. Here,

Plaintiffs' SAC—filed at our suggestion—incorporated the same thread that has tied Plaintiffs' claims together from the first:  It argues that Michigan's sentencing and parole statutes deny juvenile offenders convicted of first-degree murder a meaningful opportunity for release.  This coherent and consistent theme has animated every iteration of Plaintiffs' complaint, and it illustrates why we must reject the notion that amending a complaint somehow constitutes a new case.

Treating an amended complaint as a new case also erodes the federalism principle underlying the *Younger* doctrine.  Federalism is not a one-way street; it reflects a "sensitivity to the legitimate interests of *both* State and National Governments."  *Younger*, 401 U.S. at 44 (emphasis added).  The interests of the federal courts matter, too, and where a federal action has "proceeded well beyond the embryonic stage, . . . considerations of economy, equity, and federalism counsel against *Younger* abstention."  *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984) (citation omitted).  Later-filed state court proceedings do not require federal courts to wade into a *Younger* analysis when they and the parties have already expended significant resources to resolve the federal claims.  Both this court and the district court have invested significant time and energy on this case.  So too have the parties.  They have actively litigated this case for seven years, including engaging in discovery, a costly and burdensome process.  To jump ship now would be to exhibit a callous disregard for the meaningful litigation that has already occurred in the federal court system.**³**

Even if we were to engage in a *Younger* analysis at this juncture, abstention would be inappropriate.  To abstain under *Younger*, "(1) there must be on-going state judicial proceedings; (2) those proceedings must implicate important state interests; and (3) there must be an adequate opportunity in the state proceedings to raise constitutional challenges."  *Squire v. Coughlan*, 469 F.3d 551, 555 (6th Cir. 2006) (citation omitted).  Defendants assert that state court proceedings that arise after a litigant files a federal complaint warrant abstention if no substantial

---

**³**That federal courts may raise abstention *sua sponte* does not alter our analysis of this issue.  *See Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976).  Even when abstention is raised by a court in the first instance, the evaluation still hinges on the existence of state proceedings *at the initiation of the federal proceedings*.  *See O'Neill v. Coughlan*, 511 F.3d 638, 643 (6th Cir. 2008) (looking to the filing of the federal action to determine whether state proceedings were ongoing); *Fed. Exp. Corp. v. Tenn. Pub. Serv. Comm'n*, 925 F.2d 962, 969 (6th Cir. 1991) (discussing and relying on the "day-of-filing rule").

proceedings on the merits of the federal claims have occurred. *See Hicks v. Miranda*, 422 U.S. 332, 349 (1975). Because the merits of the claims in the SAC have yet to be resolved but resentencing proceedings are already ongoing, Defendants argue, the federal courts should abstain. True, *Hicks* and its progeny counsel against a mechanical comparison of the state and federal filing timestamps. But this court's *Younger* precedent still requires us to look to the initiation of proceedings to determine whether the first prong of *Younger* has been satisfied. *See, e.g.*, *Loch v. Wakins*, 337 F.3d 574, 578 (6th Cir. 2003) (citing *Hicks* and looking to the time the federal litigation was initiated); *Carras v. Williams*, 807 F.2d 1286, 1290 n.7 (6th Cir. 1986) (same); *Zalman*, 802 F.2d at 202–03 (same). In *Hicks*, the state court proceedings were initiated just one day after the federal plaintiffs completed service of the complaint. 422 U.S. at 338–39. Here, we are seven years into the federal case, and we cannot look at the SAC in a vacuum. Substantive proceedings on the merits of Plaintiffs' overarching claim—that Michigan denies them a meaningful opportunity for release—have occurred in that time period. Plaintiffs should not be punished because the novel position they championed in 2010 was subsequently given a voice by the Supreme Court, a development that necessitated updates to the complaint in 2016. To do so would create perverse incentives that would punish Plaintiffs' prescience in understanding the direction in which the Supreme Court was heading.

In sum, to find that the filing of the SAC required the district court to reconsider its jurisdiction would both expand and warp an otherwise cabined and clear doctrine. The resulting rule would be both untenable and unmoored from the purposes that drove *Younger*'s genesis. We decline to open the door to such a morass. Accordingly, we find *Younger* inapplicable to Plaintiffs' claims.

### D.  The *Heck* Doctrine

The district court also dismissed Counts II, IV, and VI as barred by the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994). The *Heck* doctrine concerns the availability of § 1983 claims to prisoners. It states that "habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983." 512 U.S. at 481; *see also Preiser v. Rodriguez*, 411 U.S. 475, 486 (1973) (observing that the language of the

habeas statute is more specific than § 1983, and the history of the writ makes clear that it "has been accepted as the specific instrument to obtain release from [unlawful] confinement").[4] Claims that ordinarily fall within the scope of § 1983 are unavailable to prisoners if they "necessarily imply the invalidity of [a] . . . conviction or sentence." *Heck*, 512 U.S. at 478. The word "necessarily" must not be ignored—if invalidation of a conviction or speedier release would not automatically flow from success on the § 1983 claim, then the *Heck* doctrine is inapplicable. *See Wolff v. McDonnell*, 418 U.S. 539, 554 (1974) (determining that § 1983 remains available for procedural challenges where success in the case would not necessarily result in immediate or speedier release). Although not addressed by the district court, Defendants argue that *Heck* likewise requires dismissal of Count V. We will evaluate the applicability of *Heck* to each of Counts II, IV, V, and VI.

### 1. Count II

In Count II, Plaintiffs argue that the Eighth Amendment categorically prohibits sentences of life without parole for juvenile offenders. This Count covers those class members for whom prosecutors have filed renewed motions for life without parole sentences—the same individuals who currently remain in sentencing limbo. *See supra* Part I.D. Plaintiffs argue that *Heck* is inapplicable because they are not currently confined pursuant to a valid sentence. They say that this Count instead attempts to avert the future infliction of an allegedly unconstitutional sentence, and frame it as seeking prospective relief against "the resentencing process authorized" by the revised statutory scheme. Defendants respond that because resentencing is inevitable and because success on Count II would completely remove life without parole as an option, it necessarily implicates the duration of Plaintiffs' confinement.[5] Defendants also raise the specter of a *Heck* loophole: If the window between conviction and sentencing is open to § 1983 claims, then any defendant could protract criminal proceedings by challenging his anticipated sentence.

---

[4]Although often referred to as the "*Heck* bar," this doctrine harks back to *Preiser* and was clarified in a number of other cases before the Supreme Court decided *Heck*. For ease of reference, we will nevertheless refer to it as the *Heck* bar or the *Heck* doctrine.

[5]Defendants' arguments regarding impending resentencing is in tension with another justiciability argument they raise: that Plaintiffs' claims are not yet ripe. *See infra* Part II.F.

We agree that Count II falls within the purview of *Heck*. The difference between a pre-conviction challenge and one interposed between conviction and sentencing is material. The former depends on hypotheticals while the latter deals in certainties; an accused may not be found guilty, but our criminal system mandates that a person convicted will be subject to punishment. Although Plaintiffs identify a number of cases permitting § 1983 claims before *conviction*, they cite no authority permitting § 1983 claims between conviction and sentencing. The primary case on which Plaintiffs rely, *Wallace v. Kato*, highlights the distinctly hypothetical nature of pre-conviction cases. 549 U.S. 384 (2007). The *Wallace* Court considered a challenge by an individual whose conviction was invalidated on direct appeal for lack of probable cause at the time of arrest. *Id.* at 386. The petitioner's case was remanded for a new trial but the prosecutors dismissed the charges against him instead. *Id.* at 387. He then filed a lawsuit under § 1983. *Id.* The Supreme Court held that the § 1983 claim was time-barred because the statute of limitations began to accrue at the time of his unlawful arrest. *Id.* at 391. *Heck* had not barred him from bring his civil lawsuit earlier because the doctrine does not cover claims "that would impugn *an anticipated future conviction*." *Id.* at 393. The Court noted that applying *Heck* before conviction would require § 1983 plaintiffs and courts "to speculate about whether a prosecution will be brought, whether it will result in a conviction, and whether the pending civil action will impugn that verdict . . . [and] all this at a time when it can hardly be known what evidence the prosecution has in its possession." *Id.* A pre-sentence challenge, by contrast, does not require such guesswork. Discretionary sentencing may render the precise length of a sentence somewhat uncertain, but the fact remains that an impending sentence is just that—impending.

The *Heck* doctrine instructs that no matter how a § 1983 claim is couched, if its success would necessarily affect the length of a sentence, the litigant must rely on habeas relief. Even if Plaintiffs frame their challenge as one to the sentencing process, Count II functionally asks us to declare sentences of life without parole for juvenile offenders unconstitutional. Such a ruling would necessarily implicate the duration of Plaintiffs' impending sentences by imposing a ceiling, and *Heck* therefore requires Plaintiffs to follow a different legal path to obtain the relief. Fortunately, multiple avenues remain open for Plaintiffs to challenge life imprisonment without parole, including direct appeal and habeas. But because Count II necessarily implicates the

length of their impending sentences, it is not cognizable under § 1983.  The district court properly dismissed Count II.

### 2.  Count IV

In Count IV Plaintiffs assert that "Defendants' policies and procedures governing access to prison programming and parole eligibility, consideration[,] and release" deny them a "meaningful opportunity for release on parole before the end of their natural lives."  Plaintiffs assert that Count IV does not target the length or imposition of a new term-of-years sentence; it instead seeks "a parole consideration process, during the relevant statutory eligibility period, that is fair, realistic and meaningful."  Defendants say that because Count IV is framed as a challenge to "de facto life sentences," it too implicates the length of their impending sentences, and therefore is barred by *Heck*.

The Supreme Court's decision in *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005), and this court's decision in *Wershe v. Combs*, 763 F.3d 500, 504 (6th Cir. 2014), control our analysis of Count IV.  In *Wilkinson*, the Supreme Court considered whether two prisoners could use § 1983 to seek declaratory and injunctive relief in a constitutional challenge to Ohio's parole procedures.  *See* 544 U.S. at 76.  The Court determined that in its "legal journey" through this line of cases, it had "focused on the need to ensure that state prisoners use only habeas corpus . . . when they seek to invalidate the duration of their confinement—either *directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody."  *Id.* at 81.  The Court found that the prisoners' claims were cognizable under § 1983 because a favorable judgment "at most [would] speed *consideration* of a new parole application," but it would not automatically result in speedier release.  *Id.* at 82.  The Court found persuasive the fact that the Ohio parole authorities retained discretion to deny parole.  *Id.*; *see also Wolff*, 418 U.S. at 554 (determining that § 1983 remains available for procedural challenges where success in the case would not necessarily result in immediate or speedier release).

In *Wershe*, this court considered whether a Michigan juvenile offender seeking effective parole procedures must obtain relief through habeas corpus rather than § 1983.  *See* 763 F.3d

500. Wershe had been convicted of possession of more than 650 grams of cocaine and was made technically eligible for parole when the Michigan Supreme Court eliminated a parole limitation for possession offenses in *People v. Bullock*, 485 N.W.2d 866 (Mich. 1992). *Id.* at 502. He subsequently brought suit challenging the parole procedures for failing to give him a fair opportunity for release, and the Sixth Circuit found his claim cognizable under § 1983:

> Here, though, Wershe does not seek direct release from prison or a shorter sentence; he seeks a change in the procedures used to determine whether he is eligible for parole. Because "success in [his] § 1983 claim would not necessarily affect the duration of his sentence because prison officials would retain discretion regarding whether to grant him parole," the habeas exception does not bar Wershe's § 1983 claim. *Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007).

*Wershe*, 763 F.3d at 504; *see also Wilkinson*, 544 U.S. at 80–82. The reasoning in *Wilkinson* and *Wershe* applies with equal force here, where the Plaintiffs do not seek direct release from prison or a shorter sentence, but instead seek an examination of the "Defendants' policies and procedures governing access to prison programming and parole eligibility, consideration and release." This circuit has already expressly found such challenges cognizable under § 1983. Following this clear precedent, we hold that *Heck* does not warrant dismissal of Count IV.

### 3. Count V

Count V asserts that the deprivation of good time, disciplinary, and other credits in Section 769.25a(6) violates the *Ex Post Facto* Clause of the Constitution. The district court dismissed Count V as failing to state a claim on which relief can be granted, but Defendants argue that *Heck* also demands dismissal.

At least two key *Heck* cases squarely address the interplay between good time credits and § 1983 challenges. Under the credit system at issue in *Preiser*, the restoration of credits would have automatically resulted in the deduction of time from the challenged sentence. 411 U.S. at 487. Success on the § 1983 claim necessarily implicated the duration of confinement and was therefore not cognizable. *Id.* at 487–88. By contrast, in *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Supreme Court evaluated a challenge to prison officials' revocation of good time credits by means of constitutionally infirm disciplinary proceedings. The Court found that the challenge was cognizable under § 1983 because the prisoners could obtain prospective relief—

the implementation of valid disciplinary proceedings—without necessitating restoration of their good time credits. 418 U.S. at 554–55. Because success did not mean earlier release, the § 1983 claim could proceed. *Id.* The differing outcomes of *Preiser* and *Wolff* show that the critical question is whether restoring credits automatically results in earlier release.

Under Michigan's parole system, credits deducted from a term-of-years sentence do not automatically result in earlier release; they merely hasten the date on which prisoners fall within the jurisdiction of the Michigan Parole Board. Even after an inmate falls within its jurisdiction, the Board retains discretion to grant or deny parole. *See* Mich. Comp. Laws § 791.234(11). Success on Count V would not, therefore, necessarily shorten the duration of confinement, rendering this case similar to the cognizable § 1983 claim in *Wolff*. *See also Wilkinson*, 544 U.S. at 82 (finding that success for the plaintiffs would at most speed consideration of a new parole application, or result in a new parole hearing, which would not "necessarily spell speedier release" and thus did not lie at the core of habeas corpus relief); *Wershe*, 763 F.3d at 504 (finding a § 1983 challenge to the parole process cognizable where "prison officials would retain discretion regarding whether to grant . . . parole"). *Heck* does not bar Count V.

### 4. Count VI

Count VI alleges that by failing or refusing "to provide programming, education, training and rehabilitation opportunities," Defendants have "deprived Plaintiffs of meaningful opportunities to obtain release based on their demonstrated growth, maturity and rehabilitation." Defendants argue that the district court properly dismissed Count VI under *Heck* because it "implicates the constitutionality of their (impending) sentences." But *Heck* does not bar claims that implicate the *constitutionality* of a sentence; it bars claims that necessarily implicate the *length or duration* of a sentence. Just as the *Wolff* petitioners could use § 1983 to obtain constitutionally sound disciplinary procedures without running afoul of *Heck*, Plaintiffs may use Count VI to seek better rehabilitative programming without necessarily expediting their release. Count VI seeks to make the period of confinement more meaningful, which may indirectly result in speedier release. But that indirect result flows from the discretion of the Michigan Parole Board; it does not automatically follow from success on Count VI. Accordingly, Count VI is cognizable under § 1983.

In holding that *Heck* does not bar Counts IV, V, and VI, we adhere to the lines carefully drawn by the Supreme Court and this circuit. We must look to the possible results when determining what remedies are open to prisoners bringing constitutional challenges. Where vindication of a constitutional right would necessarily allow a prisoner to walk free before his sentence expires, *Heck* instructs that he must pursue his claims via habeas. But where success would not automatically result in speedier release, *Wilkinson*, *Wolff*, and this court's decision in *Wershe* demonstrate that § 1983 remains an available remedy. Because the Michigan Parole Board retains discretion to deny parole to those who are or become eligible, success on Counts IV, V, and VI would not automatically spell speedier release for Plaintiffs. Accordingly, these claims may proceed under § 1983.

### E. The *Ex Post Facto* Clause

The district court found that Plaintiffs failed to state a claim on which relief can be granted in Count V, which argues that the retroactive elimination of their accrued credits violates the *Ex Post Facto* Clause of the Constitution. The *Ex Post Facto* Clause prohibits any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 71 U.S. 277, 325–26 (1866)). A criminal law violates the *Ex Post Facto* Clause if it (1) applies to events occurring before its enactment, and (2) disadvantages the offender affected by it. *See United States v. Kruger*, 838 F.3d 786, 790 (6th Cir. 2016) (citing *Weaver*, 450 U.S. at 29). The Supreme Court has long held that the retroactive elimination of credits implicates the *Ex Post Facto* Clause. In *Weaver*, the Court examined changes to Florida's formula for computing "gain-time" or good time credits. 450 U.S. 24. The changes did not eliminate any of the credits the petitioner earned under the old formula, but did curtail the availability of new credits. *Id.* at 27–28. The Court found that the new formula ran "afoul" of the *Ex Post Facto* Clause because it "constrict[ed] the inmate's opportunity to earn early release, and thereby ma[de] more onerous the punishment for crimes committed before its enactment." *Id.* at 35–36; *see also Lynce v. Mathis*, 519 U.S. 433, 445–46 (1997) (finding that cancellation of provisional early release credits had the effect of increasing the prisoner's punishment).

To state a claim in Count V, Plaintiffs must plausibly allege that the 2014 amendments disadvantaged them by eliminating credits they earned during their mandatory sentences of life without parole.  Section 769.25a(6) provides that a youth offender subject to resentencing "shall be given credit for time already served, but shall not receive any good time credits, special good time credits, disciplinary credits, or any other credits that reduce the defendant's minimum or maximum sentence."  No one disputes that this provision applies retroactively.  There is, however, considerable dispute between the parties as to whether the Plaintiffs earned any credits during their prior mandatory sentences of life without parole.  The district court did not resolve this dispute, but found that even if the Plaintiffs were eligible for credits while serving their mandatory sentences, their elimination did not disadvantage Plaintiffs because they could not have been used to discount their life sentences.  We first address whether Plaintiffs have sufficiently alleged that they were entitled to credits during their mandatory life sentences, and then consider whether the elimination of such credits disadvantaged them.

Plaintiffs identify several statutory provisions which they say entitled them to at least two forms of credits.  First, they note that prisoners serving sentences for crimes committed before April 1, 1987 are eligible for good time credits.  Mich. Comp. Laws § 800.33(2).  Prior to 1978, good time credits were applied to a prisoner's minimum and maximum sentences, but since 1978, good time credits have applied only to a prisoner's maximum term.  *Lowe v. Dep't of Corr.*, 521 N.W.2d 336, 336–37 (Mich. Ct. App. 1994).  Seventy-three class members were convicted for offenses occurring prior to 1987, and Plaintiffs allege that these individuals earned good time credits.  Plaintiffs also assert that the entire class became eligible for additional credits when Michigan created disciplinary credits in 1982.  The relevant statutory provision provides:

> [A]ll prisoners serving a sentence on December 30, 1982, or incarcerated after December 30, 1982, for the conviction of a crime enumerated in section 33b(a) to (cc) of 1953 PA 232, MCL 791.233b, are eligible to earn a disciplinary credit of 5 days per month for each month served after December 30, 1982.  Accumulated disciplinary credits shall be deducted from a prisoner's minimum and maximum sentence in order to determine his or her parole eligibility dates.

Mich. Comp. Laws § 800.33(5).  Section 791.233b states that one "is not eligible for parole until the person has served the minimum term imposed by the court less an allowance for disciplinary credits," and then lists the groups of offenders who may earn disciplinary credits, including

individuals convicted of first-degree murder under Section 750.316. Section 800.33 also specifies that "[a]ccumulated disciplinary credits shall be deducted from a prisoner's minimum and maximum sentence in order to determine his parole eligibility dates." Because Plaintiffs fell within Section 750.316 prior to the 2014 amendments, they allege that they were earning disciplinary credits while serving their mandatory life sentences. Defendants respond that these provisions could not have applied to Plaintiffs because, as individuals sentenced to life without parole, they had neither minimum nor maximum sentences to which such credits could be applied.

Several Michigan cases support Plaintiffs' position. In *Moore v. Buchko*, the Michigan Supreme Court evaluated a prisoner's claims seeking application of good time credits he had previously earned while serving a sentence of life without parole. 154 N.W.2d 437 (Mich. 1967). The prisoner's life sentence had been vacated on constitutional grounds, and his case remanded for a new trial, where the jury convicted him of second-degree murder and the trial judge sentenced him to a term of 25 to 40 years. *Id.* at 438. The Michigan Supreme Court determined that he was entitled to the good time credit he had earned while serving under his invalidated conviction and sentence. *Id.* at 439. In another case, a defendant was convicted of first-degree murder under Section 750.316 and sentenced to life in prison. *See Wayne Cty. Prosecuting Attorney v. Mich. Dep't of Corr.*, No. 186106, 1997 WL 33345050 (Mich. Ct. App. June 17, 1997). His conviction was reversed on appeal, but he pleaded guilty to second-degree murder rather than stand for a second trial. He then received a new sentence of 20 to 30 years. *Id.* at *1. The defendant sought the application of the credits he had earned between his first and second sentences, and even though his first sentence was indeterminate, the court gave him the credits he earned in that window. *Id.* at *3–4. We think that between these two cases and the express statutory language in Sections 791.233b and 800.33, Plaintiffs have plausibly alleged that they were eligible to earn good time and disciplinary credits during their mandatory life sentences. We therefore must determine whether Section 769.25a(6)'s retroactive elimination of these credits disadvantages Plaintiffs.

Plaintiffs point to Jennifer Pruitt's situation to illustrate how Section 769.25a(6) disadvantages them. Pruitt, a Named Plaintiff, has had an exemplary prison record and

accumulated approximately 1,500 days of disciplinary credits for her positive behavior during her mandatory life sentence.  She has been resentenced to a term 30 to 60 years, of which she has already served twenty-five years and four months.  Under Section 769.25a(6), she will not be eligible for review by the Michigan Parole Board for at least four years.  If her disciplinary credits were to be restored, she would be eligible for review now.**⁶**  Plaintiffs argue that in this way, Section 769.25a(6) "constricts [their] opportunity to earn early release, and thereby makes more onerous the punishment for crimes committed before its enactment."  *Weaver*, 450 U.S. at 35–36.  We agree that Pruitt's situation well illustrates the prejudicial effects of Section 769.25a(6).  To the extent that Plaintiffs earned credits during the mandatory life sentences, the retroactive elimination thereof is detrimental.  We find that Plaintiffs have pleaded sufficient factual information to support the reasonable inference that Section 769.25a(6) disadvantages them.  Accordingly, Plaintiffs have stated a plausible claim for relief in Count V.

**F. Ripeness**

Finally, we pause to consider Defendants' ripeness arguments, which were not addressed in the district court's opinion.  The ripeness doctrine aims "to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."  *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (citation omitted).  The Supreme Court has set forth a two-prong evaluation for addressing ripeness:  A claim is ripe where it is "fit for judicial decision" and where "withholding court consideration" will cause hardship to the parties.  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 153 (1967).

The Supreme Court has instructed that claims are fit for review if they present "purely legal" issues that "will not be clarified by further factual development."  *Thomas*, 473 U.S. at 581.  This court has heeded these instructions and found pre-enforcement facial constitutional challenges ripe for review.  *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 399 (6th Cir. 2001) (finding that a group of plaintiffs could challenge an ordinance's "judicial review provisions" even before seeking the permits that were

---

**⁶**As noted above, the Michigan Parole Board retains discretion to deny parole even after the application of good time and disciplinary credits, *see* Mich. Comp. Laws § 791.234(11), meaning that restoration thereof will not automatically result in speedier release.

the subject of the ordinance); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 290–91 (6th Cir. 1997) (determining that facial challenges to a statute on Commerce Clause and Equal Protection grounds were fit for review because they could be resolved by looking to the statutory text and constitutional precedent). Plaintiffs' claims do not turn on the individual sentences class members have received or will receive, and, therefore, no further factual development is necessary to resolve Plaintiffs' claims.

The logic of *Deja Vu* and *Magaw* apply here: Plaintiffs seek facial review of the constitutionality of specific sentencing provisions that, Plaintiffs allege, inflict constitutional harm no matter how they are applied to individuals. Count IV asks the court to consider whether the Michigan Parole Board's procedures deprive Plaintiffs of a "fair, realistic and meaningful" opportunity for release. Like the pre-enforcement challenge in *Deja Vu*, Count IV challenges the review process itself. And the process by which the Board reviews youth offenders' cases is the same for all class members regardless of when they first come within its jurisdiction. If the Board's process violates the Eighth and Fourteenth Amendments by failing to account for youth, it will harm a class member who is up for parole next week in the same way it will harm one who is up for parole next decade. Similarly, Count VI is a facial challenge to the lack of rehabilitative programming. The deprivation of education, training and rehabilitation opportunities is just as injurious to a youth offender serving 25 to 60 years as it is to a youth offender serving 40 to 60 years, especially when both individuals will eventually be subject to the same parole review process, which considers their rehabilitative efforts. Under *Deja Vu* and *Magaw*, the facial pre-enforcement challenges contemplated by Counts IV and VI are fit for judicial review.

Count V asks whether the elimination of Plaintiffs' good time credits violates the *Ex Post Facto* Clause. Michigan's sentencing scheme eliminates credits for all individuals sentenced under Section 769.25a, without regard to the length of the sentence, and the constitutionality of this deprivation is a purely legal question. In sum, Plaintiffs' facial challenges to Michigan's sentencing scheme may be evaluated independently from any one individual's sentence. The individual sentences that class members receive will not sharpen the issues or even factor into

the legal analysis necessary to resolve these claims. Accordingly, the first prong of the ripeness test is satisfied.

Plaintiffs will also suffer hardship absent judicial consideration of their claims. As Defendants have vigorously argued, resentencing under the amended scheme is inevitable and impending. *See supra* Part II.D.1. Thus, Plaintiffs face imminent harm, including delayed and arguably inadequate consideration by the Michigan Parole Board. The second prong of the ripeness test is therefore also satisfied.

Plaintiffs' surviving claims do not create the risk of entanglement in abstract disputes. Rather, they raise concrete facial constitutional challenges to an operative statutory scheme. Plaintiffs' claims in Counts IV, V, and VI are ripe. Our conclusion is cemented by the fact that a number of class members have already been resentenced pursuant to the scheme they challenge.

Withholding judicial review of these three claims, moreover, would inflict broader societal harms: Relegating these issues to piecemeal resolution by individual offenders risks duplicative litigation and inconsistent determination of constitutional questions. By contrast, evaluating the facial challenges presented in Counts IV, V, and VI in one class action will avoid patchwork decisions, promote consistency, conserve scarce judicial resources, and provide crucial guidance to the parties and the public alike.

Importantly, permitting federal adjudication of Plaintiffs' facial challenges honors the federalism principles discussed above. *See supra* Part II.C. Today's decision leaves to Michigan courts the normal task of resentencing state prisoners under state law. Should any class members wish to bring individualized challenges to their new sentences, they may do so via direct appeal or habeas. Thus, we preserve the line between federal and state court adjudication and observe the comity the federal courts owe to our state courts.

### III. CONCLUSION

This decision returns us to the question, pending since 2010, of the constitutionality of Michigan's statutory punishments for crimes committed by Plaintiffs when they were children. United States and Michigan Supreme Court cases and Michigan's statutory amendments

interceded, delaying determination of what constitutes a meaningful opportunity for release for these youth offenders.  Some of the long-pending issues are concluded by our affirmance of the district court's dismissal of Counts I and II.   Others remain, however, as we reverse the district court's dismissal of Counts IV, V, and VI.  We remand those claims for expeditious resolution in further proceedings consistent with this opinion.