RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0172p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DAN CARMAN; COIN CENTER; RAYMOND WALSH; QUIET INDUSTRIES CORP.,

*Plaintiffs-Appellants*,

*v.*

JANET YELLEN, in her official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; CHARLES PAUL RETTIG, in his official capacity as Commissioner of the Internal Revenue Service; INTERNAL REVENUE SERVICE; MERRICK B. GARLAND, Attorney General; UNITED STATES OF AMERICA,

*Defendants-Appellees*.

⎤
⎟
⎟
⎟
⎟
⎟
⎟
⎬  No. 23-5662
⎟
⎟
⎟
⎟
⎟
⎟
⎦

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:22-cv-00149—Karen K. Caldwell, District Judge.

Argued:  May 7, 2024

Decided and Filed:  August 9, 2024

Before:  MOORE, NALBANDIAN, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Jeffrey S. Hetzel, CONSOVOY MCCARTHY, PLLC, Arlington, Virginia, for Appellants.  Geoffrey J. Klimas, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:**  Jeffrey S. Hetzel, Cameron T. Norris, CONSOVOY MCCARTHY, PLLC, Arlington, Virginia, for Appellants.  Geoffrey J. Klimas, Francesca Ugolini, Ellen Page DelSole, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

———————

**OPINION**

———————

KAREN NELSON MOORE, Circuit Judge.  Plaintiffs Dan Carman, Coin Center, Raymond Walsh, and Quiet Industries Corp. ("plaintiffs") regularly transact in cryptocurrency for both personal and business matters.  They enjoy the privacy and anonymity that cryptocurrency transactions provide.  So when Congress passed amendments to 26 U.S.C. § 6050I, a law that now requires reporting of certain cryptocurrency transactions to the federal government, plaintiffs brought this lawsuit against the United States and the agencies in charge of implementing and enforcing § 6050I.[1]  The district court found that it was without jurisdiction to consider the merits of plaintiffs' constitutional challenges to the amended § 6050I, because plaintiffs' claims are either not ripe for adjudication or because the plaintiffs lack standing.  Although the district court was correct that one of plaintiffs' claims is not ripe, several of plaintiffs' claims are justiciable today.  Accordingly, we AFFIRM in part and REVERSE in part the district court's judgment, and REMAND for proceedings consistent with this opinion.

**I.  BACKGROUND**

**A.  Amended 26 U.S.C. § 6050I**

Title 26 U.S.C. § 6050I(a) requires "[a]ny person . . . who is engaged in a trade or business, and . . . who, in the course of such trade or business, receives more than $10,000 in cash" in one or more related transactions to make certain returns to the government.  *See also* R. 27 (Am. Compl. ¶ 29) (Page ID #262); *id.* ¶¶ 38–39 (Page ID #264–65) (discussing the concept of related transactions).  The return must be "in such form as the Secretary [of the Treasury] may prescribe" and should contain "the name, address, and [taxpayer identification number] of the person from whom the cash was received, . . . the amount of cash received, . . . the date and nature of the transaction, and . . . such other information as the Secretary may prescribe." 26 U.S.C.  § 6050I(b).  "Cash received by financial institutions" and cash obtained via a

———

[1]Specifically, plaintiffs have sued the Internal Revenue Service, the Department of the Treasury, and the United States, as well as the heads of those agencies and the Attorney General ("defendants").

transaction that takes place entirely "outside the United States" is not subject to the reporting requirements. *Id.* § 6050I(c).

"Trade or business" has the same meaning in the statute as it does in 26 U.S.C. § 162. *See* 26 C.F.R. § 1.6050I-1(c)(6).  Although a flexible concept, as a practical matter "trade or business" ordinarily encompasses activity whose "primary purpose" is meant to make "income or profit," as opposed to "[a] sporadic activity, a hobby, or an amusement diversion." *See Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987) ("Of course, not every income-producing and profit-making endeavor constitutes a trade or business."); *see also* R. 27 (Am. Compl. ¶ 32) (Page ID #263); 26 C.F.R. § 1.183-2(b) (enumerating relevant factors to consider when deciding "whether an activity is engaged in for profit").

Until recently, cash meant "foreign currency" or "any monetary instrument . . . with a face amount of not more than $10,000."  26 U.S.C. § 6050I(d)(1)–(2); *see also* R. 27 (Am. Compl. ¶ 30) (Page ID #262); 26 C.F.R. § 1.6050I-1(c)(1)(ii).  This included "[t]he coin and currency of the United States or of any other country" as well as, in certain scenarios, cashier's checks, bank drafts, traveler's checks, and money orders "having a face amount of not more than $10,000."  26 C.F.R. § 1.6050I-1(c)(ii)(A)–(B).  The 2021 Infrastructure Investment and Jobs Act, however, amended the definition of "cash" to include "any digital asset."  26 U.S.C. § 6050I(d)(3); R. 27 (Am. Compl. ¶ 41) (Page ID #265).  "Except as otherwise provided by the Secretary, the term 'digital asset' means any digital representation of value which is recorded on a cryptographically secured distributed ledger or any similar technology as specified by the Secretary."  26 U.S.C. § 6045(g)(3)(D); *see also* R. 27 (Am. Compl. ¶ 42) (Page ID #265).

**B.  Cryptocurrency**

One type of digital asset is cryptocurrency.  R. 27 (Am. Compl. ¶ 43) (Page ID #266). Cryptocurrency often uses "open-source code," which allows the public to view, copy, and use the code without paying. *Id.* ¶ 44 (Page ID #266).  Plaintiffs allege that a given cryptocurrency program relies on "fixed rules of operation designed to facilitate secure and reliable transactions." *Id.* ¶ 45 (Page ID #266).  To engage in transactions using cryptocurrency, users must have a "private key" and an "address," both of which are "random but unique" strings of

letters and numbers particular to an individual. *Id.* ¶¶ 46–47 (Page ID #266). To consummate a transaction, a receiver of cryptocurrency provides the sender with their unique address. *Id.* ¶ 48 (Page ID #266). The sender "digitally signs" with their private key a "transaction message" that specifies the amount of cryptocurrency to be sent. *Id.* ¶¶ 48–49 (Page ID #266).

According to plaintiffs, once this first part of the cryptocurrency transaction is complete, "miners" work to "review and validate the transaction message." *Id.* ¶ 50 (Page ID #267). Through verifying the underlying details of the transaction, such as that the proper private key was entered or that the sender has the requisite amount of cryptocurrency to send, miners' work also results in the transaction being listed on a public ledger. *Id.* ¶¶ 50, 52 (Page ID #267). Miners are incentivized to do this verification work because they receive some amount of cryptocurrency as a reward. *Id.* ¶ 51 (Page ID #267).

The hallmarks of cryptocurrency are decentralization and anonymity. Plaintiffs claim that miners do not have any personal stake in a given transaction or even know the parties to a transaction, and instead miners contribute to the transaction's completion for the reward of cryptocurrency. *Id.* Likewise, despite the fact that transactions are listed on a public ledger, the ledger reveals only the addresses involved in a transaction and the amount of cryptocurrency exchanged. *Id.* ¶¶ 53–55 (Page ID #267–68). Because the addresses themselves do not reveal any personal information, the public has little insight into the parties to a transaction. *Id.*; *see also id.* ¶¶ 67–68 (Page ID #270). If, however, "a user's personal information *is* linked to an address," substantial information about the user's transactions may be uncovered. *Id.* ¶ 58 (Page ID #268). This is so because transactions associated with a given address are listed on the public ledger. *Id.* A user might voluntarily disclose that a given address is theirs in order to facilitate transactions with them. *Id.* ¶ 60 (Page ID #268–69). But a person may be linked to an address indirectly if they share details of a given transaction, allowing someone to work backwards from the public ledger by locating the transaction and then connecting the address to the user. *Id.* Whether through law-enforcement techniques or otherwise, *id.* ¶ 61 (Page ID #270), a savvy member of the public may also be able to deduce a user's other addresses and transactions through "analyzing the activity of their known addresses," *id.* ¶ 69 (Page ID #270–71).

**C. The Interaction Between the Amended Reporting Requirements and Cryptocurrency**

Under plaintiffs' view, the amended reporting requirements will require both senders and receivers of cryptocurrency to disclose certain information. A sender of more than $10,000 in cryptocurrency will need to disclose to the receiver their Social Security Number, name, and address. *Id.* ¶ 94 (Page ID #278). The receiver will need to include this information in the report sent to the government. *Id.* A receiver of cryptocurrency will need to include their own Social Security Number, name, and address in the report as well. *Id.* ¶ 95 (Page ID #278). Along with this information, the receiver will need to report the amount of cryptocurrency received, when the transaction occurred, and its "nature." *Id.* ¶ 96 (Page ID #279) (citation omitted). Finally, the receiver will need to include "any other information required by Form 8300," which is the form used to complete the reports. *Id.* ¶ 97 (Page ID #279); *see also* 26 C.F.R. § 1.6050I-1(e)(2). Although not part of the report, a receiver must also "'verify the identity' of the sender" under 26 C.F.R. § 1.6050I-1(e)(3)(ii), by, for example, examining the sender's passport or driver's license. *Id.* ¶ 98 (Page ID #279). In addition to these requirements, receivers of cryptocurrency must follow certain procedures. They must sign the report under penalty of perjury and file the report within fifteen days of the transaction. *Id.* ¶ 100 (Page ID #282) (citing 26 C.F.R. § 1.6050I-1(e)(1)). Receivers must "furnish to each person whose name is required to be set forth in such return a written statement showing" a receiver's name, address, phone number, and the "aggregate amount of cash" received. 26 U.S.C. § 6050I(e); *see also* R. 27 (Am. Compl. ¶ 102) (Page ID #282). And receivers must retain copies of any reports made for five years. 26 C.F.R. § 1.6050I-1(e)(3)(iii); *see also* R. 27 (Am. Compl. ¶ 103) (Page ID #282).

Plaintiffs harbor serious concerns about being "forced to comply with this entire, intrusive process." R. 27 (Am. Compl. ¶ 105) (Page ID #282). Plaintiffs allege that armed with information from reports, the government will be capable of "identify[ing] [transactions] in the public ledger." *Id.* ¶ 106 (Page ID #283). Once the government has discovered the reported transaction on the public ledger, it can "ascertain the addresses of the individuals involved in the transaction" and any other transactions completed by those individuals via their addresses regardless of whether the individuals were required to report the transactions to the government in the first place. *Id.* ¶ 107 (Page ID #283). For instance, "the government can discover that a

person donated to a local mosque in 2016, paid for a son's sobriety treatment in 2018, contributed to an unpopular political cause in 2020, and hired a marriage counselor in 2022." *Id.* ¶ 108 (Page ID #283).  The government already employs certain techniques today, such as hiring "public-ledger analysts," that allow it to connect individuals to certain transactions, to ascertain the individuals' address or addresses, and to discover other transactions in which the individual was involved. *Id.* ¶¶ 109–12 (Page ID #283–84).

Plaintiffs allege more.  If the government takes these steps, it will receive "a detailed and intimate transaction history" for an individual all without having to obtain a warrant or to act on probable cause. *Id.* ¶¶ 114–15 (Page ID #285).  The information may be shared with all levels of law enforcement. *Id.* ¶ 120 (Page ID #286); *see also* 26 U.S.C. § 6103(l)(15).  And because of the record-keeping requirements, hackers or other malicious actors may be able to discern substantial information about persons subject to the reporting requirements. *Id.* ¶ 121 (Page ID #286).  Further, the information that can be gleaned from the reports unveils "activity in which [cryptocurrency users] took careful and affirmative steps to preserve their privacy." *Id.* ¶ 122 (Page ID #287).  Users will need to "report expressive associations that fall within [the requirements'] coverage and they will be required to report commercial activities that, as a result of the nature of public ledgers, allow the government to ascertain their unrelated expressive activities." *Id.* ¶ 124 (Page ID #287).  This will lead cryptocurrency users not to engage in such expressive activities; some users are already refraining from doing so. *Id.* ¶ 125 (Page ID #287).

According to the amended complaint, because of the "related" transactions requirements, receivers of cryptocurrency will likely need to demand personal identifying information from any sender of any amount of cryptocurrency because "there is no natural, common-sense way" for a receiver to know that one transaction is unrelated to another. *Id.* ¶¶ 116–17 (Page ID #285). It will be difficult to comply with the law's verification requirements, because "cryptocurrency transactions . . . occur across vast distances and can involve an indeterminate number of persons." *Id.* ¶ 119 (Page ID #286).  The law's terms also present a compliance problem.  For example, a receiver who is a miner may not be able to identify the "person" from whom they received cryptocurrency, because a miner "is automatically rewarded with new cryptocurrency when [they] perform[] mathematically verifiable work to secure the public ledger." *Id.* ¶ 126

(Page ID #287–88).  Likewise, individuals will be unable to discern if they are exempt from the reporting requirements in the case that a transaction takes place entirely outside the United States, because "cryptocurrency transactions are validated and stored on computers all around the world."  *Id.* ¶ 127 (Page ID #288).

Finally, per the amended complaint, the amended § 6050I carries both civil and criminal penalties for failing to comply with its requirements.  Both senders and receivers of cryptocurrency may face felony charges for willfully failing to comply with § 6050I's requirements or for causing another to fail to comply.  *Id.* ¶ 130 (Page ID #289); *see also* 26 U.S.C. § 7203 (a willful violation of any provision of § 6050I is a felony).  Likewise, receivers of cryptocurrency face substantial civil penalties for failing to comply with certain reporting requirements.  *Id.* ¶¶ 131–32 (Page ID #290); *see also* 26 U.S.C. § 6721(e)(2)(C) (receiver who intentionally disregards reporting requirements subject to penalty equivalent to the greater of $25,000 or the amount of cash received up to $100,000); 26 U.S.C. § 6721(a) (receiver who fails to file by required date or fails to include all required information subject to penalty of $250 per return).

**D.  The Plaintiffs**

Dan Carman is a lawyer and businessman who lives in Fayette County, Kentucky.  *Id.* ¶ 134 (Page ID #291).  He uses Bitcoin and regularly transacts in it.  *Id.*  Carman intends to receive cryptocurrency as payment in connection with his work as a Bitcoin consultant.  *Id.* ¶ 136 (Page ID #291).  He alleges that he will receive cryptocurrency payments exceeding $10,000 in both single and related transactions involved with this work.  *Id.*  Similarly, Carman plans personally to mine cryptocurrency and to do so through a company.  *Id.* ¶ 137 (Page ID #291–92).  Beyond receipt of cryptocurrency, Carman also intends to send cryptocurrency to others when engaging in certain transactions.  *Id.* ¶ 138 (Page ID #292).  He will additionally send cryptocurrency to advocacy and religious organizations as part of "advanc[ing] his expressive associations."  *Id.* ¶ 139 (Page ID #292–93).

Carman claims that because he will engage in the types of transactions covered by § 6050I, he will be required to report certain transactions to the government.  *Id.* ¶¶ 140–41

(Page ID #293).  This will in turn lead to the government discovering transactions in which Carman has participated through public-ledger analysis; "improper disclosure" of private information; and the "uncover[ing] [of] Mr. Carman's expressive associations."  *Id.* ¶¶ 143–44, 146 (Page ID #293–94).  Carman is already more reluctant to engage in certain expressive activities.  *Id.* ¶ 146 (Page ID #294).  Due to the reporting requirements, Carman will incur certain compliance costs, including spending time completing reports, tracking transactions subject to the reports, and paying accountants and lawyers to assist with the reporting requirements. *Id.* ¶ 145 (Page ID #293–94).

Coin Center is a non-profit organization that "advances the civil liberty interests of cryptocurrency users."  *Id.* ¶¶ 148, 152 (Page ID #294–95).  Like Carman, Coin Center alleges that it will likely be subject to the reporting requirements because it receives contributions and sells sponsorships in connection with its advocacy activities.  *Id.* ¶¶ 149–52 (Page ID #295).  As a result of the reporting requirements, Coin Center believes that donors will be less likely to contribute to its activities and that Coin Center, like Carman, will incur substantial compliance costs.  *Id.* ¶¶ 153–54 (Page ID #296).

Raymond Walsh is a software engineer and small businessman who owns plaintiff Quiet Industries, a Bitcoin mining company based out of Kentucky.  *Id.* ¶¶ 157, 159 (Page ID #297). Walsh often receives Bitcoin payments exceeding $10,000 in connection with his work with Quiet Industries.  *Id.* ¶ 160 (Page ID #297–98).  In connection with his mining activities, Walsh is "rewarded [with cryptocurrency] out of a common pool of assets," some of which comes from other cryptocurrency users and some of which comes from cryptocurrency software.  *Id.* Further, Walsh spends more than $10,000 in cryptocurrency in certain transactions in connection with his business.  *Id.* ¶¶ 161–62 (Page ID #298).  Like the other plaintiffs, Walsh alleges that he will incur compliance costs in connection with the new reporting requirements.  *Id.* ¶ 165 (Page ID #298–99).  Similarly, Walsh fears that the government will be able to connect him to certain transactions due to the new reporting requirements.  *Id.* ¶¶ 167–69 (Page ID #299).  Quiet Industries faces many of the same issues as Walsh.  *Id.* ¶¶ 171–75 (Page ID #300–01).

The government has not foresworn enforcement of the new reporting requirements as to any of the plaintiffs.  *Id.* ¶ 179 (Page ID #301).  Because related transactions under the new

requirements can reach back up to one year, some of plaintiffs' activities may already be subject to the law.  *Id.* ¶ 180 (Page ID #302).

**E.  The Claims**

Plaintiffs launch five distinct constitutional attacks on the amended § 6050I, including a Fourth Amendment claim, a First Amendment Claim, a Fifth Amendment vagueness claim, an enumerated-powers claim, and a Fifth Amendment self-incrimination claim.  *Id.* ¶¶ 184–270 (Page ID #302–30).  For each of these, plaintiffs bring facial challenges, meaning they contend all (or almost all) applications of the law are unconstitutional. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Johnson v. United States*, 576 U.S. 591, 602–03 (2015). That creates some confusion, however, because their legal theories, as we note in our analysis, sound in as-applied challenges by contending that specific applications of § 6050I or hypothetical future events tied to the statute would create constitutional infirmities. *See* R. 27 (Am. Compl. ¶¶ 184–255, 266–270) (Page ID #302–26, 329–30). Yet, for all claims, plaintiffs' requested relief is the same:  a declaration that § 6050I is facially unconstitutional and that enforcement of the law be enjoined. *Id.* at 76 (Page ID #331).

Plaintiffs' first claim is that the amended § 6050I violates the Fourth Amendment. Specifically, plaintiffs claim that the amended law compels senders and receivers of cryptocurrency in reported transactions to "share their personal identifying information in conjunction with the details of their covered transactions, and thereby reveal sensitive details about their personal affairs."  *Id.* ¶ 190 (Page ID #304).  Because of the private nature of cryptocurrency transactions, plaintiffs contend that they have a reasonable expectation of privacy and that the amended law will invade that expectation of privacy, all without the need for a warrant.  *Id.* ¶¶ 189, 192–93 (Page ID #303–04).  Plaintiffs additionally claim that the government will conduct searches by violating their property rights.  *Id.* ¶¶ 196–201 (Page ID #305–07).

Plaintiffs' First Amendment claim turns on freedom of association.  Plaintiffs aver that the reporting requirements will "chill protected associational activities" by requiring those who wish to remain anonymous to be subject to disclosures and by potentially exposing to retaliatory

actions by the government those who donate to expressive associations.  *Id.* ¶¶ 221–22 (Page ID #312–13).  Because the reporting mandate "will require parties to reveal expressive associations to the government," it will "chill and is already chilling protected associational activities in at least three ways."  *Id.* ¶ 229 (Page ID #316).  These include allowing the "government to ascertain the unrelated expressive associations of parties to all covered transactions" through "public-ledger analysis," *id.* ¶ 230 (Page ID #316); increasing the likelihood that malicious actors like hackers will obtain information and be capable of linking transactions to individuals, *id.* ¶ 231 (Page ID #316–17); and "directly mandat[ing] the reporting of expressive associations," *id.* ¶ 232 (Page ID #317).  Plaintiffs allege that the law is not narrowly tailored and is thus unconstitutional.  *Id.* ¶ 236 (Page ID #318).

Plaintiffs' first Fifth Amendment challenge to the amended § 6050I is a vagueness challenge.  In essence, plaintiffs argue that the law's requirements, which were developed in the context of face-to-face physical-cash transactions, do not map onto cryptocurrency.  *Id.* ¶ 242 (Page ID #319–20).  Plaintiffs claim that they will face substantial confusion and compliance issues with understanding how several of the law's requirements and definitions comport with cryptocurrency transactions.  *See id.* ¶¶ 243–45 (Page ID #320–21) (discussing "person from whom the [digital assets were] received"), 246–47 (Page ID #321–22) (similar, with respect to "person"), 248–49 (Page ID #322–23) ("receipt"), 250 (Page ID #323) ("entire transaction occurs outside the United States"), 251–52 (Page ID #323–24) ("trade or business"), 253 (Page ID #324–25) ("structuring" transactions), 254 (Page ID #325) ("verify[ing] the identity" of a sender).  Given this confusion, plaintiffs allege that § 6050I is unconstitutionally vague.  *Id.* ¶ 255 (Page ID #325–26).

Plaintiffs also claim that Congress has exceeded its enumerated powers by promulgating the amended § 6050I.  Although Congress may pass laws that are "necessary and proper" to aid in executing its powers, *id.* ¶ 260 (Page ID #327) (quoting U.S. Const., art. I, §8, cl. 18), plaintiffs argue that the amended § 6050I is a disproportionate "surveillance" regime that is not necessary to carrying out Congress's taxing powers, *id.* ¶ 263 (Page ID #328).  Plaintiffs likewise contend that the law cannot be justified under Congress's power to regulate interstate commerce.  *Id.* ¶ 264 (Page ID #329).

Finally, plaintiffs claim that the amended § 6050I violates the Fifth Amendment because it infringes their right against self-incrimination.  Plaintiffs acknowledge that the Supreme Court has rejected the position that the Fifth Amendment protects against production of any incriminating evidence, as opposed to testimony.   *Id.*  ¶¶ 267–69  (Page  ID  #329–30). Nonetheless, plaintiffs have brought this claim "to preserve it for further review."   *Id.* ¶ 268 (Page ID #330).

## F.  Procedural Background

Plaintiffs filed a complaint in this case on June 10, 2022, R. 1 (Compl.) (Page ID #1–71) and subsequently filed an amended complaint on November 28, 2022, R. 27 (Am. Compl.) (Page ID #256–333).  On December 12, 2022, defendants moved to dismiss the amended complaint for both lack of jurisdiction and for failure to state a claim.  R. 29 (Mot. to Dismiss at 1) (Page ID #339).  Defendants argued that each of the four plaintiffs in this case lacked standing to press each of their claims, arguing in effect that all of the plaintiffs' injuries were either too speculative or not cognizable.  R. 29-1 (Defs.' Mem. at 7–19) (Page ID #349–61).  Defendants additionally contended that several of plaintiffs' claims, including their Fourth Amendment search claim, First Amendment free-association claim, and Fifth Amendment vagueness claim, were not ripe. *Id.* at 19–21 (Page ID #361–63).  Finally, defendants argued that all of plaintiffs' claims failed on the merits regardless of any jurisdictional issues.  *Id.* at 21–40 (Page ID #363–82).

Plaintiffs opposed all of defendants' arguments.  R. 32 (Pls.' Opp.) (Page ID #392–441). Plaintiffs claimed that a variety of injuries supported standing for their pre-enforcement challenge, including that they are directly subject to the reporting mandate, that they will incur compliance costs, that they will be forced to disclose information against their will, that they will suffer economic harm, that they will be forced to change their behavior, and that they face a credible threat of enforcement should they fail to comply with the reporting mandate.  *Id.* at 11–18 (Page ID #410–17).  Plaintiffs likewise argued that all of their claims are ripe.  *Id.* at 18–20 (Page ID #417–19).  Finally, plaintiffs opposed all of the defendants' merits arguments.  *Id.* at 21–40 (Page ID #420–39).

The district court agreed with defendants on justiciability grounds.  R. 34 (Op.) (Page ID #466–87); *Carman v. Yellen*, No. CV 5:22-149-KKC, 2023 WL 4636883 (E.D. Ky. July 19, 2023).  The district court first found that plaintiffs' Fourth Amendment claim was not ripe, because the amended § 6050I is not yet effective, the Department of Treasury intended to promulgate rules to implement the reporting requirements, and plaintiffs' apparent theory of harm rested on a number of contingent events.  R. 34 (Op. at 9–12) (Page ID #474–77).  Next, the district court found that plaintiffs lacked standing to bring a First Amendment challenge, because any potential injuries amounted to nothing more than subjective chill, meaning that the injuries were not imminent.  *Id.* at 12–17 (Page ID #477–82).  The district court similarly found that the First Amendment challenge was not ripe, and that any potential harms or threats of enforcement were not concrete or imminent.  *Id.*  Turning to vagueness, the district court found that the claim was not ripe because the Department of Treasury was still engaged in rulemaking, and that a federal court should refrain from interpreting the statute in the first instance before final agency action.  *Id.* at 17–18 (Page ID #482–83).  The district court found plaintiffs' enumerated-powers claim unripe for the same reasons it found the Fourth Amendment claim unripe.  *Id.* at 18–20 (Page ID #483–85).  Finally, the district court found that the plaintiffs' Fifth Amendment self-incrimination claim was not ripe, because plaintiffs have yet to assert the right against self-incrimination.  *Id.* at 20 (Page ID #485).  At the end of its analysis, the district court also commented on certain of plaintiffs' claimed injuries, including harms to their businesses and compliance costs.  *Id.*  The district court stated that these injuries could not suffice to create standing or to overcome the ripeness issues in the case because the injuries are not linked to plaintiffs' claims.  *Id.* at 20–22 (Page ID #485–87).  The district court found that this was not the case for the enumerated-powers claim but that the claim was nonetheless not ripe and any injuries connected to that claim too speculative.  *Id.* at 21 (Page ID #486).  Plaintiffs timely filed a notice of appeal on July 21, 2023.  R. 36 (Not. of Appeal) (Page ID #489–90).

Since plaintiffs filed their appeal, defendants have filed a Rule 28(j) letter, discussing Treasury's and the IRS's proposed rulemaking regarding the amended § 6050I.  DE 24-1 at 1–2. The IRS issued "transitional guidance" stating that digital assets need not "be included when determining whether cash received in a single transaction (or two or more related transactions) meets the reporting threshold" until final regulations pertaining to "application of section 6050I

to digital assets" are published.     Internal Revenue Service, *Announcement 2024-4*, https://perma.cc/59K6-92XM (last accessed May 13, 2024).

## II.  DISCUSSION

### A.  Standard of Review

"We review de novo a district court's grant of a motion to dismiss for lack of subject matter jurisdiction." *Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014).  At this juncture, we accept the facts as pleaded by the plaintiffs. *Id.*  This includes facts supporting our subject-matter jurisdiction. *Id.*  The party invoking federal jurisdiction bears the burden of proving that we have jurisdiction over a given claim. *Id.*

### B.  Standing Generally

The general requirements of standing are familiar.  Under Article III of the Constitution, federal courts are limited to hearing "Cases" and "Controversies."  U.S. Const. art. III, § 2.  To ensure that a case or controversy is before a court and to avoid rendering an advisory opinion, three basic requirements must be met. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks and citations omitted).  "Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* at 560–61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (alterations in original)).  "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).  "The party invoking federal jurisdiction" must establish these elements commensurate with the burden of proof required at each stage of a litigation. *Id.*

Standing is assessed on a claim-by-claim basis and "is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6

(1996)); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (discussing cases). Even if a plaintiff has standing to press a particular claim or to challenge a particular provision of a law deemed to be unlawful, they may lack standing to challenge other provisions of the law that have not caused their injury. *See, e.g.*, *California v. Texas*, 593 U.S. 659, 679 (2021). Likewise, if a plaintiff's injury does not derive from the purportedly unlawful conduct or provision, but instead from some other source, a plaintiff will lack standing because the injury will not be "fairly traceable to enforcement of the allegedly unlawful provision." *Id.* (internal quotation marks and citation omitted).

Other hallmarks of the standing analysis are familiar, too. For one, standing should not be assessed against the merit (or lack thereof) of a claim. *See, e.g.*, *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 463 (6th Cir. 2020) ("[O]ne must not confuse weakness on the merits with absence of Article III standing." (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015))). "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," standing "often turns on the nature and source of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Second, "establish[ing] standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." *Lujan*, 504 U.S. at 561. If so, a plaintiff may more easily establish an injury in fact and show that the challenged action both causes the injury and would be redressed through a favorable judgment. *Id.* at 561–62; *see also Allen v. Wright*, 468 U.S. 737, 757–58 (1984) (explaining that it may be "substantially more difficult to meet the minimum requirements of [Article] III" when an injury stems from the actions of a third party (internal citation and quotation marks omitted)), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

Finally, in the preenforcement context, we impose additional requirements to ensure that an injury is imminent. We consider whether the party seeking to invoke federal jurisdiction has demonstrated (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); (2) that their "intended future conduct is 'arguably . . . proscribed by [the] statute'" at issue, *id.* at 162 (quoting *Babbitt*, 442 U.S. at 298)

(alterations in original); and (3) that "the threat of future enforcement . . . is substantial," *id.* at 164.

## C.  Ripeness

"[T]he ripeness doctrine traditionally incorporates both constitutional and prudential elements." *Kiser*, 765 F.3d at 606.  The constitutional elements of ripeness encompass traditional parts of the standing inquiry:  namely, whether a plaintiff "is threatened with 'imminent' injury in fact." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) (quoting *Lujan*, 504 U.S. at 560); *accord Susan B. Anthony List*, 573 U.S. at 158–59.  If a case is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" it is not constitutionally ripe. *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

On the other hand, prudential ripeness, although closely related, has been called into question in recent years. *See, e.g.*, *Susan B. Anthony List*, 573 U.S. at 167 (commenting on the questions surrounding "the continuing vitality of the prudential ripeness doctrine"); *Lexmark*, 572 U.S. at 126 (recognizing that prudential standing doctrines are "in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging" (internal quotation marks and citations omitted)). Nonetheless, this court as well as other circuits have continued applying the doctrine particularly when important future intervening events, such as impending regulatory action, will clarify the dispute or obviate the need for weighing in on contingencies. *See Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 291–92 (6th Cir. 1997) ("We believe a federal court should not intervene and determine whether a statute enacted by Congress is unconstitutionally vague on its face before the agency with rulemaking authority has had an opportunity to interpret the statute."); *see also, e.g.*, *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021) (considering whether claim was prudentially ripe post-*Lexmark*, and concluding claim was "fit for judicial decision because . . . 'judicial intervention' would not 'inappropriately interfere with further administrative action'" (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998))).  Prudential ripeness is concerned with (1) whether a claim is fit for judicial review; and (2) the hardship to the parties.  *Kiser*, 765 F.3d at 607 & n.2.

**D.  Certain of Plaintiffs' Claims are Not Ripe[2]**

The related doctrines of Article III standing and ripeness are both limits on a federal court's ability to hear a case.  *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66–67 (1997)).  We begin our analysis with ripeness.  And on this basis, we hold that plaintiffs' vagueness and self-incrimination claims are not ripe, but that the remainder of their claims are.

The district court resolved many of the issues in this case on ripeness grounds, finding that plaintiffs' Fourth Amendment, R. 34 (Op. at 9–12) (Page ID #474–77), First Amendment, *id.* at 16–17 (Page ID #481–82), Fifth Amendment vagueness, *id.* at 17–18 (Page ID #482–83), enumerated powers, *id.* at 18–20 (Page ID #483–85), and Fifth Amendment self-incrimination, *id.* at 20 (Page ID #485), claims were all not ripe.  The district court appeared to rely principally on prudential ripeness factors when deeming these claims not ripe.  *See, e.g.*, *id.* at 12 (Page ID #477) (finding that the hardship to plaintiffs is minimal as it relates to the Fourth Amendment claim because plaintiffs do not yet need to report their transactions).  And the district court appeared to suggest that as a general matter no claim can be ripe when a law has yet to go into effect.  *See, e.g.*, *id.* at 19 (Page ID #484).  Plaintiffs rightly note that most of the district court's findings and defendants' arguments on ripeness concern prudential, not constitutional, matters.  Appellants' Reply at 15.  Further, the district court's view that plaintiffs brought claims too early merely because the law is not yet in effect is unsound.  *See, e.g.*, Appellants' Br. at 35 (collecting cases).  Still, with respect to plaintiffs' vagueness and self-incrimination challenges, ripeness problems abound.

**1.  Vagueness**

We begin with vagueness.  Plaintiffs do not suggest that the amended § 6050I is, on the whole, vague.  Rather, plaintiffs take issue with myriad provisions of the law and *how those provisions might apply*.  The hypothetical nature of this claim is self-evident from plaintiffs'

---

[2]Although we begin with a discussion of ripeness, plaintiffs would have standing for their claims for reasons discussed later in this opinion.  We, of course, "have an independent obligation to assure ourselves of our own jurisdiction."  *Kerchen v. Univ. of Michigan*, 100 F.4th 751, 759 (6th Cir. 2024).  We begin with ripeness for purposes of framing the issues.

amended complaint, and at this juncture it is not fit for our review.**3** For example, plaintiffs suggest that it is difficult to determine who is a "person from whom the [digital assets were] received," R. 27 (Am. Compl. ¶ 243) (Page ID #320), when it comes to miners, decentralized exchanges, and transactions involving numerous users, *id.* ¶¶ 244–46 (Page ID #320–21). Of course, plaintiffs may never engage in these transactions. This confusion would not arise in the simple case when one individual transfers cryptocurrency to another individual. Similarly, plaintiffs claim that the term "receipt" is vague but allege only one example: a case when a sender transfers assets to a "multi-signature" address or to an address controlled by multiple people. *Id.* at ¶ 248 (Page ID #322). As before, plaintiffs do not suggest that an individual-to-individual transaction would create this type of vagueness. In essence, this problem pervades all of the plaintiffs' vagueness allegations. *See, e.g.*, ¶¶ 250 (Page ID #323) ("entire transaction occurs outside the United States"), 251–52 (Page ID #323–24) ("trade or business"), 253 (Page ID #324–25) ("structuring" transactions), 254 ("verify[ing] the identity" of a sender) (Page ID #325). Plaintiffs ask us to evaluate the facial constitutionality of § 6050I against transactions that may never occur and that plaintiffs themselves may never undertake. *Contra* Appellants' Reply at 18 ("Plaintiffs allege that the statute's requirements are unconstitutional no matter what.").

Plaintiffs broadly argue that "[f]acial challenges to [laws] are generally ripe the moment the challenged [law] is passed." Appellants' Br. at 38 (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10 (1997)). But that discussion in *Suitum* concerned one *specific* type of claim: Fifth Amendment takings claims premised on the theory that mere passage of a statute or regulation constitutes a taking. *Suitum*, 520 U.S. at 736 ("We held that the only issue justiciable at that point was whether mere enactment of the statute amounted to a taking."). The quoted footnote clarifies that "[*s*]*uch*" challenges are generally ripe the moment a law is passed. *Id.* at 736 n.10 (emphasis added). And plaintiffs' reliance on *Hill v. Snyder*, 878 F.3d 193 (6th Cir. 2017), is similarly misplaced. Appellants' Br. 38. *Hill* concerned facial challenges to a sentencing law's review processes and an alleged denial of rehabilitative programming.

---

**3**We hold that plaintiffs' vagueness challenge is not fit for review on essentially prudential grounds but explain why plaintiffs' arguments concerning ripeness more generally do not call for a different result.

878 F.3d at 214.  The case has nothing to do with vagueness.  Instead, *Hill* reiterates the black-letter proposition that "claims are fit for review if they present 'purely legal' issues that 'will not be clarified by further factual development.'"  *Id.* at 213–14 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985)).

No doubt, facial vagueness challenges are permissible.  But *Johnson v. United States*, 576 U.S. 591 (2015), does not help plaintiffs.  Appellants' Reply at 19.  For one, *Johnson* did not raise any standing or ripeness issues:  the petitioner was sentenced under the at-issue provision. 576 U.S. at 595.  Here, however, there is considerable uncertainty over whether any of plaintiffs' alleged vagueness issues will come to pass.  More basically, the petitioner in *Johnson* did not argue that the law as a whole was void for vagueness but instead contended that the particular provision under which he was sentenced was.  *Id.* at 597–98 (speaking only to the residual clause).  Plaintiffs suggest that their challenge is no different, yet in fact they are merely creating hypothetical situations under which myriad separate provisions of § 6050I *might be* vague.

We cannot invalidate § 6050I based on scenarios that may never come to pass.  Nor do we have authority to opine generally on its constitutionality.  Plaintiffs have not pointed us to a case when a preenforcement-facial-vagueness challenge was ripe, presumably because such cases benefit from factual development and applications of statutory provisions to particular scenarios.  Plaintiffs' pleading makes clear that we would be wading into the world of the hypothetical should this claim be allowed to proceed at this juncture.  Although it is possible that plaintiffs could be ultimately correct that *certain* provisions of § 6050I could be vague, we do not have a constitutional license to issue an advisory opinion on these questions in the abstract.[4]

Another fact cuts against plaintiffs on this point:  pending regulatory action and the agency's moratorium on enforcement until regulations go into effect.  Below, both the district court and defendants were of the view that mere regulatory uncertainty meant that the case as a whole was not ripe.  As a general matter, there is no hard rule that such uncertainty or a lapse in

---

[4]As mentioned, this conclusion is reinforced by the fact that plaintiffs bring a *facial* vagueness challenge to the constitutionality of § 6050I, despite relying on hypothetical scenarios that make their claim look like an as-applied challenge.  *See Johnson v. United States*, 576 U.S. 591, 602–03 (2015); *United States v. Salerno*, 481 U.S. 739, 745 (1987).

time between when a lawsuit is brought and when a law might take effect render a challenge not ripe.  *See, e.g.*, *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 538 (6th Cir. 2011) (facial challenge was ripe despite being brought several years before law was to take effect when there was "no reason to think that plaintiffs' situation will change" and "no reason to think the law will change"), *abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007) (fact that regulations had not been promulgated did not render claim unripe because "[r]egulations could not alter the [a]ct's provisions, which clearly establish the healthcare spending and reporting requirements that [the plaintiff] claims are invalid" and thus question was "purely legal").  But plaintiffs' cited authority generally adds little to their argument that their vagueness challenge is ripe despite pending notice-and-comment rulemaking that may limit § 6050I's reach or that may redress certain of plaintiffs' concerns (*e.g.*, clarifying how transactions involving miners must be reported).  *Thomas More Law Center* concerned purely legal issues:  namely, whether Congress exceeded its authority under the Commerce Clause or imposed an unconstitutional tax.  651 F.3d at 534.  *Retail Industry Leaders* involved similar challenges to whether a state law could even exist.  475 F.3d at 185–86 (challenges included ERISA-preemption claim, equal-protection claim, and claim under Maryland Constitution).

Try as they might, plaintiffs cannot avoid binding precedent on this point, either.  In *National Rifle Association of America*, we considered challenges to the Crime Control Act, a federal statute which regulated certain firearms.  132 F.3d at 277–78.  The plaintiffs brought several claims, including a due-process vagueness claim, an enumerated-powers claim, an equal-protection claim, and certain APA claims.  *Id.* at 278.  In an opinion that sounds in both constitutional and prudential ripeness concerns, *see, e.g.*, *id.* at 291, we held that all of the plaintiffs' preenforcement claims were ripe *other than* their vagueness challenges, *id.* at 291–93.  With respect to claims other than the vagueness challenge, we held that the challenges to the law's very passage were ripe because "[t]he statute [could not] be interpreted more narrowly on an 'as applied' basis in order to avoid these constitutional issues" and "[e]nforcement of the [a]ct . . . would not serve to further sharpen or focus their Commerce Clause or Equal Protection challenges."  *Id.* at 291.  But the same was not true of the plaintiffs' vagueness challenge.  *Id.* at 292–93.  Although we did note the since-rejected idea that a vagueness challenge must be as-

applied as opposed to facial, *id.* at 292, the animating principle for our holding that the vagueness claim was not ripe was that "a federal court should not intervene and determine whether a statute enacted by Congress is unconstitutionally vague on its face before the agency with rulemaking authority has had an opportunity to interpret the statute," *id.* Further factual development, including regulatory guidance and enforcement actions, would help hone the vagueness issues. *Id.* And more basically, it was clear that "[b]ecause there are possible valid applications, a vagueness challenge to" certain provisions of the at-issue statute was not ripe. *Id.* at 293.

The same concerns that *National Rifle Association* discussed with respect to a preenforcement-facial-vagueness challenge apply with equal force here. Forthcoming regulations may meaningfully narrow § 6050I's scope, ameliorate certain of plaintiffs' claimed injuries, or result in plaintiffs (or certain of their transactions) not falling under § 6050I's requirements altogether. Regardless, regulations would certainly influence a vagueness challenge that hinges on what certain statutory definitions mean and how § 6050I will apply. Plaintiffs have no answer for *National Rifle Association* other than to point to irrelevant factual points that do not meaningfully distinguish the case from this one. Appellants' Reply at 19.

### 2. Self-incrimination

Only a word is in order with respect to the ripeness of plaintiffs' Fifth Amendment self-incrimination claim. As a general matter, a Fifth Amendment self-incrimination claim is not ripe until a claim of the privilege is actually made. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 72–75 (1974) (holding that self-incrimination claim based on forced reporting not ripe because "[w]e cannot, on the basis of supposition that privilege will be claimed and not honored, proceed now to adjudicate the constitutionality under the Fifth Amendment" (citation omitted)). No claim of privilege has been made, and so plaintiffs' challenge on this ground is not ripe. Plaintiffs' alternative basis for claiming a violation of this privilege—that any production of reports or documents to the government implicates the privilege—is squarely foreclosed by binding Supreme Court precedent, and so to the extent plaintiffs press this theory, we dismiss it on the merits. *United States v. Hubbell*, 530 U.S. 27, 34 (2000) ("The word 'witness' in the

constitutional text limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character.").

### 3. Enumerated Powers, Fourth Amendment, and First Amendment

The district court largely repeated its above analyses with respect to plaintiffs' enumerated powers, Fourth Amendment, and First Amendment claims. And on certain points, we agree with the district court that plaintiffs appear to rely on contingencies that may never come to pass in order either to advance certain legal theories or to bolster their claims. But scrutinizing plaintiffs' claims demonstrates that plaintiffs have ripe claims for purposes of their enumerated powers, Fourth Amendment, and First Amendment claims.

Plaintiffs' enumerated-powers claim is clearly ripe. Neither the district court nor defendants realistically suggest that none of the plaintiffs will be subject to § 6050I. And even if we do not know the precise contours of how § 6050I will be implemented, what transactions it will actually cover, and how many of plaintiffs' transactions will be at issue, none of these issues undermine that the very statute's existence imposes costs on plaintiffs and subjects them to regulations with which they do not wish to comply. The enumerated-powers claim presents an exceedingly simple, pure legal issue: either Congress exceeded the powers given to it by the Constitution or it did not. No factual development would aid in the disposition of this claim. And it was ripe the moment Congress passed the law. *Thomas More L. Ctr.*, 651 F.3d at 538; *Hill*, 878 F.3d at 213–14. Neither the district court nor defendants persuasively suggest otherwise. Instead, they seek to recast plaintiffs' enumerated-powers claim by stating that it is coterminous with their Fourth Amendment claim. R. 34 (Op. at 18) (Page ID #483) ("[T]he alleged harm arising from this claim is seemingly the Government's 'surveillance' of those whose cryptocurrency transactions are disclosed under the amended § 6050I."). But taking plaintiffs' pleading at face value—that Congress acted *ultra vires* by promulgating a law that is not necessary or proper to carrying out its taxing power—presents a legal question that can be resolved today and raises none of the same concerns as plaintiffs' vagueness challenge.

Plaintiffs' First and Fourth Amendment claims are not so simple. But for reasons discussed in our standing discussion, *see infra*, the claims are constitutionally ripe. We pause,

however, to discuss certain issues surrounding these claims with respect to their fitness for review.  On one read of plaintiffs' complaint and plaintiffs' arguments, their Fourth Amendment claim would seem not fit for our review.  Plaintiffs suggest that the government will undertake substantial investigative efforts to connect the transactions they must report to the public ledger, then to discern what the plaintiffs' addresses are, and then to discover a litany of undisclosed transactions that may offer insight into the intimate details of plaintiffs' lives.  By undertaking this series of actions, the government allegedly will invade the plaintiffs' Fourth Amendment rights.  But to explain this Fourth Amendment theory is to demonstrate its issues.  *See, e.g.*, *Hill*, 878 F.3d at 214 (suggesting that "claims [that] create the risk of entanglement in abstract disputes" are not ripe); *Doe v. Oberlin Coll.*, 60 F.4th 345, 356 (6th Cir. 2023) (ripeness issue related to selective-enforcement claim cured because "since the filing of the amended complaint, we have learned that [college] closed its investigation into the incidents").[5]

But plaintiffs have also put forth a Fourth Amendment claim premised on the text of § 6050I that implicates all reporting mandated by this provision.  Plaintiffs appear to reframe the issue on appeal to suggest that their claim concerns the initial reporting of information to the government, *not* what the government might do with that information down the line.  *See, e.g.*, Appellants' Br. at 42.  Under this theory, plaintiffs argue that even the mere disclosure of a specific transaction to the government implicates the Fourth Amendment bar on unreasonable searches regardless of any further steps taken by the government.  That is, under this theory the initial information transmitted to the government is entitled to Fourth Amendment protection; we do not need to look at the mischief that law enforcement could undertake, such as trying to discern what plaintiffs' addresses are.  *See, e.g.*, *Chandler v. Miller*, 520 U.S. 305, 313 (1997) (state-mandated drug testing necessary to be qualified to be political candidate was a search); *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (entertaining facial Fourth Amendment challenge to law that required hotel owners to produce registries to law enforcement upon demand).  As in *Chandler* and *Patel*, such a facial Fourth Amendment challenge poses no

---

[5]Again, this theory looks like an as-applied challenge, suggesting that this particular application is unconstitutional. If plaintiffs were to succeed on this as an as-applied challenge, their alleged injuries—having to comply with the disclosure requirements and pay compliance costs—would not necessarily be redressed. So we continue to analyze plaintiffs' claims as facial challenges, as they request.

reviewability issues because it is premised on solely the disclosures that must actually be made based on the text of the statute, not what law enforcement intends to do with the information or how the law will be enforced.  And such a challenge would seem akin to that addressed by the Supreme Court in *Shultz* concerning the depositor-plaintiffs' claim that a law requiring them to report certain incoming or outgoing foreign-bank transactions to the government violated the Fourth Amendment.  416 U.S. at 59–63.  Although the Court considered standing issues with other claims, this claim premised on the mere disclosure of reports to the government was decided on the merits.  *Id.* at 63 (holding that regulations were "reasonable in the light of [their] statutory purpose, and consistent with the Fourth Amendment").

The same is true of the First Amendment claim.  One ostensible version of this claim is based on a causal chain that may never come to pass:  principally, as with the Fourth Amendment claim, that the government will undertake efforts to discover substantial information about plaintiffs' expressive activities and associations that is not otherwise self-evident from the initial reports.  By way of an example, plaintiffs allege that the reporting mandate "will chill expressive activity because it will allow the government to ascertain the unrelated expressive associations of parties to all covered transactions . . . [through the use of] public-ledger analysis" and "will all but guarantee that hackers will be able to access and publicize the information contained in §6050I reports."  R. 27 (Am. Compl. ¶¶ 230–31 (Page ID #316–17).  As above, these claims of First Amendment harm apply only in certain limited circumstances that rest on too many contingencies and thus pose reviewability issues.

As with the Fourth Amendment claim, however, a narrower version of the claim appears ripe now:  that the "reporting mandate will directly mandate the reporting of expressive associations."  *Id.* ¶ 232 (Page ID #317).  In essence, under this theory, plaintiffs allege that the mere disclosure of transactions to the government impedes their First Amendment associational rights, regardless of the government's decision (or not) to undertake further investigation.  Because there is no question that at least some of the plaintiffs will need to make § 6050I reports, it is appropriate for a court to consider whether the mere disclosure of covered transactions implicates the First Amendment and passes the requisite level of constitutional scrutiny if so.  *See, e.g.*, *Gerber v. Herskovitz*, 14 F.4th 500, 506–07 (6th Cir. 2021) (distinguishing cases

premised on "subjective chill" because the plaintiffs were not merely alleging "that general state policies or surveillance chilled [their] exercise of free speech"); *see also Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (considering First Amendment challenge to California's law requiring charities to disclose names and addresses of donors who contributed over $5000) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)). Again, at this stage, we take no position on whether § 6050I reports in fact implicate the First Amendment or address concerns about means–ends tailoring if it does. Instead, we accept at this stage plaintiffs' theory of substantive unconstitutionality: that mere disclosure of the information required by § 6050I reports without more implicates plaintiffs' associational rights. *Gerber*, 14 F.4th at 507.

In line with the above, the district court erred by finding that plaintiffs' enumerated-powers, Fourth Amendment, and First Amendment claims are not ripe. Although plaintiffs may not proceed on the theories that the government *may* abuse the information it obtains via disclosures, which are akin to as-applied challenges based on speculative scenarios, plaintiffs also put forth theories that require no further factual development and that appear to raise only legal issues stemming from the face of the statute.

**E. Plaintiffs Have Suffered an Injury in Fact for Purposes of Their Ripe Claims**

Separate and distinct from any ripeness issues, defendants also claim that plaintiffs have failed to plead adequately an injury in fact for all of their claims. Accordingly, we consider if plaintiffs' ripe claims—the enumerated-powers claim, First Amendment claim, and Fourth Amendment claim—nonetheless have an injury-in-fact problem. Because plaintiffs have pleaded facts showing that they will indeed be subject to the reporting requirements in some form or another and pay compliance costs, the district court should have proceeded to the merits on these claims.

As with ripeness, plaintiffs' First and Fourth Amendment claims have much in common with respect to injury in fact. Plaintiffs have pleaded that they will engage in at least *some* transactions that require § 6050I reports. But they do not wish to make the required disclosures. Without even considering plaintiffs' myriad other pleaded injuries, including compliance costs

and economic harms, two basic points combine to show that plaintiffs have pleaded an injury in fact for their First and Fourth Amendment claims.

First, there is no question that, per the amended complaint's allegations, at least some of the plaintiffs will have to report at least some of their transactions.  Although the government disputes this, *see infra*, we know that "[w]hen the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." *Lujan*, 504 U.S. at 561.  When there is no doubt that the plaintiff is the direct object of the law, regulation, or government action, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* at 561–62.

Plaintiffs' alleged harm flows from being subject to § 6050I.  Indeed in similar cases, directly regulated parties had standing to pursue Fourth Amendment, *see, e.g.*, *Chandler*, 520 U.S. at 313; *Patel*, 576 U.S. at 418; *Shultz*, 416 U.S. at 59–63, and First Amendment claims, *see, e.g.*, *Davis*, 554 U.S. at 733 (explaining that plaintiff had standing to challenge disclosure requirement precisely because plaintiff would be "spared [] from making those disclosures" if requirement were declared unconstitutional).  Under these theories, the very disclosure of the information required by § 6050I is injurious, and because plaintiffs have pleaded they will have to make the disclosures, they have suffered an injury in fact as the direct objects of the action at issue.  *See, e.g.*, *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements."); *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) ("There is no doubt that the Bank is regulated by the Bureau.  Under *Lujan*, the Bank therefore has standing to challenge the constitutionality of the Bureau.").  Again, *Shultz*, another disclosure case, proves the point.  There was no question that the depositor-plaintiffs had standing for their Fourth Amendment claim because it was clear that these plaintiffs would be required to report certain income under the relevant statute and regulations.  *Shultz*, 416 U.S. at 63.  And with respect to the ACLU's First Amendment challenge, the organization lacked standing only because the ACLU failed to plead facts that

suggested that it would be subject to the reporting requirements, not because having to comply with the law as a regulated entity would not constitute an injury. *Id.* at 76.  Plaintiffs allege here that they will be subject to § 6050I and that those forced disclosures will harm them.

Plaintiffs have little difficulty demonstrating an injury in fact for purposes of their enumerated-powers claim.  Although plaintiffs must demonstrate their standing on a claim-by-claim basis, there is no reason why the same injury that provides the plaintiffs with standing to bring their First and Fourth Amendment claims—being directly subject to the disclosure requirements—would not suffice to create standing for their enumerated-powers claim.  *See State Nat'l Bank*, 795 F.3d at 54 (direct regulation theory of injury sufficed when "[t]he Bank is not challenging an agency rule that regulates its conduct . . . but rather is challenging the legality of the regulating agency itself").  In any event, because this claim is that the statute is *void ab initio*, we see no reason why any of the injuries that plaintiffs identify would not suffice.  *See, e.g.*, *Kentucky v. Yellen*, 54 F.4th 325, 342–43 (6th Cir. 2022) (compliance costs met injury-in-fact requirement for spending-clause violation); *Rice v. Village of Johnstown*, 30 F.4th 584, 591 (6th Cir. 2022) (holding that "palpable economic injuries" in the form of "family's economic interest in developing its property" met injury-in-fact requirement for procedural-due-process claim (quoting *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972))).

The district court appears to have recognized this with respect to the enumerated-powers claim but still found that plaintiffs lacked standing.  The district court's reasoning is not persuasive.  First, the district court took plaintiffs' claim out of context.  Rather than looking at the claim as pleaded and the injuries tied to the claim, the district court found that "the alleged harm arising from this claim is seemingly the Government's 'surveillance' of those whose cryptocurrency transactions are disclosed under the amended § 6050I." R. 34 (Op. at 18) (Page ID #483).  Although plaintiffs paint a dystopian picture of § 6050I, this claim does not rely on the existence of a surveillance regime.  And in any event, the injuries asserted for purposes of standing are not dependent upon the substantive merit of the claim.  With respect to injury, the district court simply discounted the allegations in the amended complaint.  The district court stated that "Plaintiffs never allege that compliance costs and decreased revenues result from [the enumerated-powers] claim, instead focusing on the Government's implementation of a

surveillance regime." R. 34 (Op. at 21) (Page ID #486). But plaintiffs' claim, on the one hand, is that Congress could not have constitutionally passed § 6050I, and their asserted injuries on the other—costs, compliance, and the like—result from being regulated by the law.  Plaintiffs' requested relief—a declaration that § 6050I is unconstitutional and an injunction—would cure their pleaded injuries.

Neither the district court's nor defendants' other views on the injury-in-fact requirement rest on solid ground. The district court found that the plaintiffs could not rely on the plethora of injuries that they allege that they will suffer—including being objects of regulation, suffering from economic harms, and incurring compliance costs—to create standing for their claims. *Id.* at 20–21 (Page ID #485–86).  The district court based this overarching finding on Judge Batchelder's lead opinion in *American Civil Liberties Union v. National Security Agency*, which did not garner a majority. *See* 493 F.3d 644, 648 (6th Cir. 2007) (Lead Op.) (showing that Judge Gibbons concurred in only the judgment and that Judge Gilman dissented); *id.* at 688 (Gibbons, J., concurring) (concurring in the judgment because the plaintiffs "failed to provide evidence that they are personally subject to" the challenged action, and refusing to "reach the myriad other standing and merits issues" discussed by the lead and dissenting opinions). The lead opinion in *ACLU* scrutinized the plaintiffs' claims and stated that the plaintiffs lacked standing through a sort of mixed standing and merits analysis. *Id.* at 653 (Lead Op.).  This was so because, according to the lead opinion, "a cause of action is intertwined with an injury." *Id.*  Yet the lead opinion did not cite any cases to support this proposition.  And the analysis appears to merge the merits and standing inquiry, which the Supreme Court has explicitly held is inappropriate. *See Davis v. United States*, 564 U.S. 229, 249 n.10 (2011); *see also, e.g.*, *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489 (6th Cir. 2021) ("[J]ust because a plaintiff's claim might fail on the *merits* does not deprive the plaintiff of *standing* to assert it.") (collecting cases).

Picking up where the district court left off, defendants' appellate briefing on the standing issue is entirely devoted either to problematizing the merits of plaintiffs' claims or to questioning whether the plaintiffs are even subject to the reporting mandate.  With respect to the former, defendants suggest that in every case that a plaintiff alleges a violation of an individual constitutional right, they must initially make a showing that the violation is at a minimum

"colorable" or "arguable."  Appellees' Br. at 18; *see also CHKRS*, 984 F.3d at 489 ("[O]nce the plaintiff has alleged a 'colorable' or 'arguable' claim that the defendant has invaded a legally protected interest, the plaintiff has met this element of an Article III injury.").  According to defendants, this language in *CHKRS* imposes some additional initial examination of the merits of plaintiffs' claims as a threshold standing matter.  *CHKRS*, however, is more circumscribed than defendants suggest.  *CHKRS* drew this language principally from *Steel Company v. Citizens for a Better Environment*, a case in which the Court addressed an issue of *statutory* standing in the first instance and rejected addressing statutory merits issues prior to examining Article III standing.  523 U.S. 83, 92–94 (1998).  *Steel Company* held that a failure of a claim on the merits implicates constitutional standing only when a claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."  *Id.* at 89 (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)).  *Steel Company* then held that it was inappropriate to make this merits-style determination at the outset or to deem such an issue "jurisdictional."  *Id.* at 92–93.  In other words, *Steel Company* rejects the approach taken by the defendants in their briefing.  *See id.* at 109–10 (holding that the federal courts lacked jurisdiction because "none of the relief sought by respondent would likely remedy its alleged injury in fact").

Similarly, defendants rely on *Parsons v. United States Department of Justice* to create some new rule that constitutional claims require specific types of injury.  801 F.3d 701, 711–13 (6th Cir. 2015); Appellees' Br. at 18.  But *Parsons* says no such thing.  Instead, *Parsons* examined standing to bring First Amendment, procedural-due-process, and APA claims premised on the "chilling effects on [the plaintiffs'] freedoms of speech and association; stigmatic reputational injury; and various harms inflicted by third-party law enforcement agencies, such as improper stops, detentions, interrogations, searches, denial of employment, and interference with contractual relations."  *Id.* at 711.  We then analyzed the plaintiffs' standing on a claim-by-claim basis, and held that the plaintiffs' reputational and stigmatic injuries coupled with allegations of chill met the injury-in-fact requirement for the First Amendment and procedural-due-process claims, and that the plaintiffs' claimed "freedom from placement" on the challenged report sufficiently alleged a procedural injury for the plaintiffs' APA claims.  *Id.* at 711–13.  Nowhere in *Parsons* did we suggest that only a *particular* kind of injury could suffice

to create standing for a *particular* kind of constitutional claim.  Our caselaw shows the opposite is true.  *See, e.g.*, *Rice*, 30 F.4th at 591; *Yellen*, 54 F.4th at 342–43.

The defendants' next line of attack boils down merely to contesting allegations in the amended complaint, which is impermissible at the motion-to-dismiss stage.  For instance, defendants reach outside the amended complaint to question whether plaintiffs have any privacy interests in shielding their transactions, because such transactions are likely already reported on income-tax returns.  Appellees' Br. at 22–23.  Similarly, the defendants question whether certain plaintiffs are subject to the amended § 6050I or whether cryptocurrency transactions are ever truly private.  *Id.* at 24–31.  But at the motion-to-dismiss stage, we are compelled to treat the plaintiffs' allegations as true.  *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019).  Likewise, "general factual allegations of injury resulting from the defendant's conduct may suffice because in considering a motion to dismiss, we presume that general allegations embrace those specific facts that are necessary to support the claim."  *Id.* (quoting *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014)) (internal quotation marks omitted).

At this juncture, the district court's and defendants' approach of disregarding plaintiffs' claimed injuries does not appear appropriate.  Nothing in our caselaw suggests that we may discount  plaintiffs' claimed injuries at the motion-to-dismiss stage; instead, we must accept what plaintiffs have pleaded with respect to their injuries and ask only whether such injuries are sufficient to meet the injury-in-fact requirement and accord with the rest of the standing analysis.  *See* 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FED. PRAC. & PROC. JURIS. § 3531.4 (3d ed. 2023) (explaining that "standing can be supported by a very slender reed of injury").  So, for example, we accept that, based on plaintiffs' allegations, they will be subject to an unreasonable search by dint of being compelled to make the requisite disclosures to the IRS.  And we accept at this stage that such disclosures hurt their associational rights.**[6]**

---

**[6]**Defendants have additionally invoked, at least in passing, several doctrines that they did not raise below and that the district court did not consider.  For example, defendants suggest that the zone-of-interests test might show that plaintiffs cannot rely on certain injuries for their claims.  Appellees' Br. at 62–63.  Further, they argue that plaintiffs cannot rely on third-party standing to assert claims.  *Id.* at 63–64.  The zone-of-interests test is a prudential limit on hearing cases and does not limit our constitutional jurisdiction.  *See, e.g.*, *Huish Detergents, Inc. v. Warren*

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM IN PART and REVERSE IN PART the district court's judgment and REMAND for proceedings consistent with this opinion.

---

*County*, 214 F.3d 707, 710 (6th Cir. 2000).  Given defendants' failure to raise the doctrine below, we do not consider the argument.  Although issues of third-party standing of course relate to our subject-matter jurisdiction, plaintiffs are not invoking third-party injuries to assert their standing to sue.